In the Matter of the Application of the POUGHKEEPSIE BRIDGE COMPANY to Acquire Lands of ROBERT SANFORD.

A statutory authority is requisite to justify the taking of private property for public use under the power of eminent domain, and the officers or body claiming the right must be able to point to a statute conferring it.

In construing statutes which are claimed to authorize the exercise of the power of eminent domain a strict, rather than a liberal construction is the rule; this rule is especially applicable to delegations of the power by the legislature to private corporations.

Under and by the charter of the Poughkeepsie Bridge Company (Chap. 897, Laws of 1871), it was the legislative intent that the company should first locate the bridge and the avenues of approach thereto, having in view present and prospective interests, and that the site and lines of approach should be located before the commencement of the work of construction.

After a legal location of the bridge and its approaches had been made by the filing of a map and profile, properly certified as required, and after the commencement of the work of construction, the company made a new location of an approach on one side of the bridge, and filed a new map and profile and commenced proceedings for the purpose of acquiring title to lands embraced in the new, but not included in the old location, *held,* that the company had no authority to condemn the land; that the original location was final and could not be changed without express legislative authority.

The provision of said charter referring to and incorporating into it the sections of the General Railroad Act (Chap. 140, Laws of 1850), prescribing the proceedings to be taken to acquire title to land, does not include the provision of said act (§ 23), authorizing a corporation organized under it to change the route first selected.

(Argued January 31, 1888; decided February 28, 1888.)

APPEAL from order of the General Term of the Supreme Court in the second judicial department, made January 3, 1888, which affirmed an order of Special Term appointing commissioners to appraise the compensation to be made for lands sought to be taken by the petitioner.

The Poughkeepsie Bridge Company was incorporated by the act chapter 897 of the Laws of 1871, passed May 10, 1871. By the first section of the act the persons therein named were created a body corporate by the name and style of "The Poughkeepsie Bridge Company," for the purpose of constructing and maintaining a permanent bridge, appurtenances and avenues of approach thereto, for the passage and transportation of passengers, railroad trains, teams, vehicles cattle, horses, sheep, swine and other merchandise and property to and from the east and west banks of the Hudson river at some point below the city of Poughkeepsie and the town of Lloyd on said river," with a proviso that the bridge shall be commenced on or before July 1, 1872, and be completed and open for and on or before January 1, 1876. By the second section the corporation was authorized to purchase, acquire, hold and use as much real estate as may be necessary for the site of said bridge, and of all piers, abutments, walls, toll-houses, etc., "and for the opening and maintaining of proper and necessary avenues of approach to said bridge, not to extend over two miles from each end or terminus of the bridge."

By the third section the capital stock was fixed at $2,000,000, with the right to increase it to $5,000,000, and any railroad corporation was authorized to subscribe for and own not exceeding five per cent of the capital stock by any one corporator so subscribing, and the directors of the bridge company were authorized to lay rails "upon the said bridge and on the said avenues of approach" for the passage of railroad trains under such agreement and compensation, and on such terms as may be agreed upon with any railroad corporation or corporations, but at least fifty per cent of the capital stock was required to be distributed to individuals in case so much should be subscribed for by individuals. By the fifth section

power was conferred on the board of directors to cause such examination and examinations and surveys to be made as may be necessary in their judgment for the " selection of the most advantageous site for the said bridge, the buildings, structures and yards, and the avenues of approach to the same," and to enter upon the land or waters of any persons for that purpose.

By the seventh section the directors were authorized to fix rates of toll for persons, animals and vehicles entering upon or crossing the bridge, except such as are being conveyed on railroad cars or trains, not exceeding a maximum rate specified.  By the twelfth section any railroad corporation, whose road shall have a terminus at the bridge or shall connect with the same, or either of its avenues of approach or which shall run its trains in connection with any such road, is permitted to use the bridge and the avenues of approach for railroad purposes, upon such terms as may be agreed upon by the board of directors of the bridge company, and such corporation and the bridge company is prohibited from giving any preference, but is required to afford equal accommodation and facilities to all railroad corporations using the bridge.

The thirteenth section declares, " if the corporation hereby created shall be unable to agree for any reason with the owner or owners of any real estate required for its purposes, as herein provided, for the purchase thereof, it shall have the right to acquire the same in the manner and by the like special proceedings as are authorized and provided for, for the the obtaining of title to real estate required for the purposes of a railroad corporation under the fourteenth section of the act entitled ' An act to authorize the formation of railroad corporations and to regulate the same,' passed April second, one thousand eight hundred and fifty, and the other sections of the said act relative thereto, and any acts amendatory thereof or in addition thereto ; and for such purposes and for that purpose all such acts shall be considered applicable to the corporation hereby created as far as may be in the like manner as if the same were named therein, and such modifications may be made in the formal part of the proceedings in order

to apply the same to the corporation hereby created, instead of a railroad corporation, as shall be approved of by the Supreme Court, and the said court at Special Term or otherwise may make such orders and regulations as to the mode and manner of conducting the proceedings and all things relative thereto so as to effectuate and make the same valid for acquiring title to such real estate, as the said court may deem proper, and the title thus acquired by the corporation hereby created shall vest in it the fee simple of the said lands and real estate."

Sections 14 and 15 are as follows :

" § 14. The corporation hereby created, before constructing any part of said bridge, its appurtenances and avenues of approach, shall make a map and profile of the same as intended to be adopted, which shall be certified by the president and engineer and filed in the office of the state engineer and surveyor and the offices of the county clerks of the counties respectively in which the same or any part of the same is to be made or constructed.

" § 15. The avenues of approach herein authorized, except the main entrances to said bridge, shall not be over twelve rods in width and shall be located with the view of connecting with public highways laid out or which may be proposed to be laid out, and with the roads of railroad corporations proposing to use said bridge, as in the act provided; and the corporation hereby created is hereby required to allow and permit any railroad corporation now formed and organized to connect their roads with the avenues or approaches to and from said bridge on which rails may be placed for the passage of railroad trains as herein provided."

By chapter 857 of the Laws of 1872, the time limited in in the first section of the original charter for the commencement of the bridge was extended to January 1, 1874, and for the completion of the bridge to January 1, 1879. There has been no change in the time fixed in the act of 1872, for commencing the construction of the bridge, but by subsequent acts the time for its completion has been extended from time

to time, the last act being chapter 695 of the Laws of 1887, which requires the bridge to be completed and opened on or before January 1, 1889. The act of 1887 also amends the original act by making the bridge a railroad bridge exclusively that is it substitutes in place of the clause in section 1 of the original act, declaring the purpose of the incorporation, the words, "for the purpose of constructing and maintaining a permanent bridge, etc., for the passage and transportation of railroad trains," etc. In December, 1873, the company before commencing the construction of the bridge, made a map and profile of the proposed bridge, "with the avenues of approach," which was certified by its president and engineer, and filed in the office of the state engineer and surveyor, and in the offices of the county clerks, pursuant to section 14 of the charter. The map and profile represented the location of the bridge and a line of approach to the bridge on the west side of the river, and also a line of approach on the east side of the river, extending from the east end of the bridge for the distance of about a mile to a junction with the Poughkeepsie and Eastern Railroad near Hamilton street in the city of Poughkeepsie, where it terminated. The company, after filing the map, and in the same month, December, 1873, commenced the construction of the bridge and proceeded with the work during the years 1874 and 1875, but in 1876 the work was suspended and was not resumed until 1886. It does not appear that the company took any proceedings to acquire title to the land covered by the approach located in 1873. On the 31st of August, 1887, the company made a new location of an approach on the east side of the river and filed a certified map and profile thereof September 12, 1887. The board of directors, when the new line was located, adopted a preamble and resolution as follows:

"*Whereas,* The map and profile of the Poughkeepsie bridge as submitted by the chief engineer and approved November 25, 1873, indicates a partial line of approach through the city of Poughkeepsie; and

"*Whereas,* Said partially indicated line of approach does not, in the opinion of the board of directors, offer proper or suffi-

cient facilities for the connection with such railroads as may reach the bridge, and by reason also of the elevation of the grade line of said bridge it has become unadvisable to construct a line of approach as therein partially indicated ; be it

"*Resolved*, That so much of the line of approach as is shown by said map and profile in the city of Poughkeepsie, approved November 25, 1873, be and the same is hereby changed and altered so as to conform to the line shown on the map and profile dated August 31, 1887, and adopted this day, and the said partial line is hereby merged into said new line of approach as though the said new line had been originally adopted November 25, 1873."

The line of location of 1887 is coincident with the line of 1873 for a distance of about half a mile east from the bridge where it diverges from the line of 1873, and, in its course, crosses the land of the appellant Sanford, which was not crossed by the line of 1873, but is about half a mile distant therefrom.

This proceeding was commenced by the company after the filing of the map of 1887, for the purpose of acquiring title to the lands of Sanford within the new location. It was resisted on the ground that the company had no authority to change the line located in 1873, or to locate a new line in 1887, or to proceed *in invitum* to take his property for an approach to the bridge. The objections of the land owners were overruled by the courts below and this appeal is brought to review the order of the General Term sustaining the order of the Special Term appointing commissioners of appraisal.

*O. D. M. Baker* for appellant. The provision in section 14 of the charter that the company, "before constructing any part of said bridge, its appurtenances and avenues of approach, shall make a map and profile of the same" and file it, was not directory. (*Head* v. *Providence Ins. Co.*, 2 Cranch, 127 ; *People* v. *Schermerhorn*, 19 Barb. 540, 558 ; *Brooklyn Steam Transit Co.* v. *City of Brooklyn*, 78 N. Y. 525, 535.) Power to change the line of a work of this character, after having been located, does not exist, in the absence of express legis-

lative authority to make it. (*H. & D. Canal Co.* v. *N. Y. & E. R. R. Co.* 9 Paige, 228; *Mason* v. *B. C. & N. R. R. Co.*, 35 Barb. 381; *People* v. *B. F. & C. I. R. R. Co.*, 89 N. Y. 88; *B. C. & N. Y. R. R. Co.* v. *Pottle*, 23 Barb. 21; Comyns Dig., Title "Election" C. 2; Wood's Railway Law, § 238, pp. 752, 753, 755; *Brigham* v. *Agricultural Branch R. R. Co.*, 1 Allen, 316.) After having adopted and filed the map and profile of 1873 within the prescribed time, the respondent was authorized to construct upon the line then located. (*Davidson* v. *B. & M. R. R. Co.*, 3 Cush. 106; *Boynton* v. *P. & S. R. R. Co.*, 4 id. 469; *Old Col. R. R. Co.* v. *Miller*, 125 Mass. 1; *Whitman* v. *B. & M. R. R. Co.*, 7 Allen, 326.) Power to alter the route will not authorize a change of *termini*. (*Att'y Gen'l* v. *West Wis. Railway Co.*, 36 Wis. 466; *People* v. *A. & V. R. R. Co.*, 24 N. Y. 261–267.) The company must show that the land sought to be taken is covered by the authorized location. (*Hazen* v. *B. & M. R. R. Co.*, 2 Gray, 574.) The land owner may raise the question as to the authority to make the location. (*Little Miami R. R. Co.* v. *Naylor*, 2 Ohio St. 235; *Brigham* v. *Agricultural Branch R. R. Co.*, 1 Allen, 316.)

*James W. Perry* for respondent. A statute must, if possible, be so construed as to carry out the intention of the lawmakers and to give it a practical operation, and not so as to nullify it or to make it in any respect inoperative. (*Holmes* v. *Carley*, 31 N. Y. 290, 291; *Smith* v. *People*, 47 id. 336, 337, 338, 339, 340, 341; *People* v. *Potter*, 42 How. 361; *Rosenplanter* v. *Roselle*, 54 N. Y. 262; *Noble* v. *Lacombe*, 99 id. 49.) The provision of the statute directing the corporation before constructing any part of the bridge, appurtenances and avenues of approach to make and file a map, is directory. (Sedgwick on Statutory and Constitutional Law, 370, 371, 376; *People* v. *Supervisors of Ulster*, 34 N. Y. 272, 273; *In re El. R. R. Co.*, 7 Hun, 412; *Witherell* v. *Mosher*, 9 id. 241; *Wood* v. *Chapin*, 13 N. Y. 509; *People* v. *T. & B. R. R. Co.*, 37

How. 431; *People* v. *B. & A. R. R. Co.*, 70 N. Y. 568; *People* v. *N. Y., L. E. & W. R. R. Co.*, 104 id. 58, 67; *People* v. *A. & S. R. R. Co.*, 24 id. 261; *People* v. *R. & S. L. R. R. Co.*, 76 id. 299, 300.) The company is expressly authorized to alter or change the line of route of any of its approaches or of any part thereof. (Chap. 140, Laws of 1850, §§ 14, 21, 22; Chap. 897, Laws of 1871, § 13; *In re N. Y. C. & H. R. R. Co.* v. *M. L. Co.*, 63 N. Y. 326; *In re N. Y. C. & H. R. R. Co.*, 77 id. 248; *In re N. Y. El. R. R. Co.*, 70 id. 352; 3 Abb. [N. C.] 423.) The route of the avenue of approach here in question, passing over land of appellant, must be decreed to be established as to him. He is now concluded by the location thereof. (§ 13, Chap. 897, Laws of 1871; Fiero on Special Proceedings, 597, 598; *In re N. Y. & B. R. R. Co.*, 62 Barb. 87; *In re N. Y. Bridge Co.*, 67 id. 300.)

ANDREWS, J. The power of eminent domain which resides in the state as an attribute of sovereignty, is nevertheless dormant until called into exercise by an act of the legislature. Until a statute authorizes an exercise of the power, it is latent and potential merely, and not active or efficient, and the state can neither exercise the prerogative, nor can it delegate its exercise, except through the medium of legislation. Therefore it is that wherever an attempt is made either by the officers of the state or by a corporation organized for a public purpose to take private property under the power of eminent domain, the officers or body claiming the right must be able to point to a statute conferring it. In the absence of statutory authority private property cannot be invaded by this power, however strong may be the reasons for the appropriation. In construing statutes which are claimed to authorize the exercise of the power of eminent domain, a strict rather than a liberal construction is the rule. Such statutes assume to call into active operation a power which, however essential to the existence of the government, is in derogation of the ordinary rights of private ownership and of the control which an owner

usually has of his property. The rule of strict construction of condemnation statutes is especially applicable to delegations of the power by the legislature to private corporations. The motive of the promoters of such corporations is usually private gain, although their creation may subserve a public purpose. When such corporations claim to exercise this delegated power, the rule of strict construction accords with the ordinary rule that delegations of public powers to individuals or private corporations are to be strictly construed in behalf of the public, and by the other principle that private rights are not to be divested except by the clear warrant of law.

The right of the Poughkeepsie Bridge Company to take the land of Sanford embraced within the line of approach located by the company in 1887, is resisted by him on the ground that the filing of the map and profile of the bridge and its approaches in 1873, operated as a legal location of the bridge and the approaches, and that the power of eminent domain conferred by the charter, is by the true construction of the act, confined to the taking of lands within the lines of the original location. The bridge company on the other hand insists that it has the right to condemn land within the location of 1887, although not embraced in the location of 1873, upon two grounds, *first*, that by the true construction of the charter the company is empowered to locate and construct at any time, and from time to time, whenever in the judgment of the board of directors it shall deem it necessary, new approaches to the bridge within the two-mile limit, and for that purpose to condemn lands on the line of such new avenues of approach ; and *second*, that under the charter it has the right to change any line of approach at its discretion, with the same power to take private property *in invitum* as pertained to the original location. We are of opinion that neither of the claims urged on behalf of the company is well founded. The claim that the legislature intended to confer upon the company the power to take lands at any time in the future and at any point within the two-mile limit for new approaches, should have clear support in the language of the charter before it should be

allowed to prevail. If the claim is well founded it permits the company to hold suspended over all the lands in the city of Poughkeepsie, within two miles of the bridge, for all time, the power of eminent domain to be exercised in its discretion. It would certainly be an extraordinary grant of power to a private corporation which would expose a community to the uncertainties attendant upon such a state of the law. The claim has, we think, no support in the charter. It is doubtless true that more than a single avenue of approach on either side of the bridge was contemplated when the act was passed. The bridge, as originally designed, was to be both a railroad bridge and a bridge for ordinary highway uses. The second section therefore empowered the corporation to purchase, acquire and hold real estate for the site of the bridge " and necessary avenues of approach." The fifth section authorized the board of directors to make examinations and surveys with a view to the selection of the " most advantageous site for the said bridge, buildings, structures and yards, and the avenues of approach," and to enter upon private lands for that purpose. The fourteenth section expressly enacts that " before constructing any part of the bridge, its appurtenances or avenues of approach," the company shall make and file a certified map and profile of the same as intended to be adopted. The thirteenth section grants the power of eminent domain to be exercised " for the purposes as herein provided." It will be observed that the map and profile mentioned in the fourteenth section, which the company is required to make and file before constructing any part of the bridge, is to comprehend the " avenues of approach " in the plural. The examination and surveys authorized by the fifth section are for the purpose of locating a site for the bridge and the " avenues of approach." It is, we think, the obvious construction of the charter that the legislature intended that the company should, in the first instance, locate the bridge and the avenues of approach thereto, having in view present and prospective interests, and that the site and lines of approach should be located before the work of

construction should be commenced. We find no indication
in the charter that new locations can be made from time to
time. The avenues of approach by the fifteenth section were
to be located with a view of connecting with existing high-
ways and with highways proposed to be laid out, and with
existing railroads and those which might thereafter be con-
structed. But there is nothing to indicate that the company
was to await the actual laying out of new highways or the
organization of new railroad corporations before finally determ-
ining and locating the approaches. No duty was imposed on
the company to connect with new railways or with new high-
ways. The company was simply required to permit existing or
new railroads to connect with the avenues of approach to the
bridge. The map and profile filed in 1873 was a legal location
of the bridge and the approaches. It was made and filed pursu-
ant to the plain requirements of the charter. It is possible
that if the company, without having made and filed the map,
had commenced the construction of the bridge without comply-
ing with this condition precedent, it could thereafter have made
its location upon the construction that the fourteenth section
was primarily a limitation upon the time of commencing the
construction of the bridge rather than upon the time of filing
the map and survey. This we need not consider. The
company did comply with the statute and did file the map
and survey locating the bridge and its approaches. This, we
think, exhausted its power of choice and the location so made
was final and could not be changed in the absence of legislative
authority. This view is supported by judicial opinions and
decisions. (*H. & D. Canal Co.* v. *N. Y. & E. R. R. Co.*,
9 Paige, 323; *Mason* v. *Brooklyn City & N. R. R. Co.*,
35 Barb. 381; *Morehead* v. *Little M. R. R. Co.*, 17 Ohio,
349; *Same* v. *Naylor*, 2 Ohio St. 235.) The company
might have originally selected the line of 1887. But it
selected another line, and the choice once made was final
in the absence of statutory authority to make a change.
(See Wood's Railway Laws, 752 *et seq* and cases cited.)
The *second* ground urged in behalf of the bridge company

.to support these proceedings rests upon what seems to us an erroneous construction of section 13 of the charter. It is insisted that this section incorporates by reference into the charter not only section 14 of the general railroad act of 1850, and the related sections prescribing the proceedings to be taken to acquire title to land authorized to be taken for railroad purposes, but also section 23, which authorizes corporations organized under that act, to change the route first selected under the circumstances mentioned in the section, and to make and file a new map, and which also confers power to acquire title to the lands embraced in the altered or changed route.    The power to change the route of a railroad was first conferred on railroad corporations by chapter 404 of the Laws of 1847, after the decision in the case of *Hudson and Delaware Canal Company* v. *New York and Erie Railroad Company* (*supra*), which decision probably led to the enactment of that statute.    There is no express power given to the bridge company by its charter to change its approaches when once located, and section 23 of the general railroad act, which confers the power upon railroad corporations, cannot, upon any reasonable construction, be regarded as incorporated into the charter of the bridge company by section 13. That section simply incorporates into the charter the sections of the general railroad act which prescribe the procedure for acquiring title to lands.    It does not enable the company to re-locate a line once located, or to acquire lands for such re-location.    Nor is the bridge company a railroad corporation. It is a bridge corporation, with power to construct a bridge for the passage of railroad trains, and as incident to this use to make approaches and to lay rails thereon, to adapt it to this use.    It is not organized to operate a railroad, but to provide facilities for railroads to cross the Hudson river.    By section 13 of the charter the court is authorized to modify the formal part of the proceedings for acquiring lands permitted in the general railroad act, as may be required to "apply the same to the corporation hereby created, instead of a railroad corporation."

Upon the grounds indicated, we have reached the conclusion

that no legislative authority exists to support this proceeding. The new line of 1887 is probably preferable to that of 1873. But we are of opinion that without a new grant of power, lands not embraced in the original location, cannot be taken compulsorily by the company.

The orders of the General and Special Terms should, therefore, be reversed and the proceedings dismiss

All concur.

Ordered accordingly.