## NORTHEASTERN GAS TRANSMISSION COMPANY
## v. WILMA T. ALLEN ET AL.

SUPERIOR COURT     FAIRFIELD COUNTY     FILE No. 83690

Memorandum filed July 18, 1951.

Marsh, Day & Calhoun, of Bridgeport, for the Plaintiff.

Cummings & Lockwood, of Stamford, for the Defendants.

CULLINAN, J. Proceeding under the authority of a Connecticut Public Act, approved May 26, 1950, and titled: "An Act Concerning Natural Gas Pipe Line Companies," the petitioner, a natural gas pipe line company, has instituted a series of legal actions in Fairfield County wherein it seeks to acquire, under its power of eminent domain, permanent and temporary easements for the construction, operation, maintenance and alteration of natural gas pipe lines and the installation of compressor stations, appliances and other necessary equipment within the State of Connecticut and more particularly within Fairfield County. It is the petitioner's plan to run its natural gas lines across Connecticut from Greenwich to the Massachusetts border, and, as is obvious, a substantial portion of the lines must traverse Fairfield County and, under the presently designed route, will require partial use of the respondents' properties. Respondents are resisting this condemnation effort, contending,

among other things, that the legislation under which the petitioner purports to act is unconstitutional and contending further there are substantial jurisdictional questions which merit judicial determination.

Section 5 of the "Act Concerning Natural Gas Pipe Line Companies" provides, in part, that: "When at any stage of condemnation proceedings brought under this act it shall appear to the court or judge before whom such proceedings are pending that the public interests will be prejudiced by delay, said court or judge may direct that such corporation be permitted to enter immediately upon the property to be taken and devote it temporarily to the public use specified in said petition upon the deposit with said court of a sum to be fixed by said court or judge."

The petitioning company now seeks the right to immediate possession of the respondents' properties and the limited question for my determination is whether the company has established that "the public interests will be prejudiced by delay" so that a right of immediate entry should be granted under the provisions of § 5 of the act.

In approaching the problem it should be remembered that, in considering the power of eminent domain, the courts have uniformly held that such power derogatory to private rights is to be strictly construed and is not to be extended or broadened by judicial construction. Authority to condemn is to be strictly construed in favor of the owner and against the condemnor and it must be strictly pursued. *Crawford* v. *Bridgeport,* 92 Conn. 431, 435; *State* v. *McCook,* 109 Conn. 621, 630; *West Hartford* v. *Talcott,* 138 Conn. 82, 90. The soundness of this fundamental concept of law is immediately apparent when it is considered that the power to condemn private property is an exercise of the strong arm of the government to take property for public use without the owner's consent, and, since it is a high prerogative of sovereignty, it cannot be exercised with abuse or carelessly or for unsubstantial reasons. Similarly, the petitioner's right to immediate entry upon the lands of the respondents, if it is to become superior to their inherent and constitutional right to undisturbed possession of those holdings, must be clear and unambiguous and wholly in the public interest.

In justification of its petition for immediate possession, the petitioner asserts that the corporations which are now serving Bridgeport, Stamford, Greenwich and New Britain with manufactured gas and who are prepared to convert to the distribution

of natural gas upon construction of the natural gas pipe lines are unable to produce an adequate supply of the commodity for the legitimate uses of the affected communities. Likewise it is said that anticipated stepped-up war production will substantially increase necessity for gas for industrial purposes in the immediate future and it is further claimed that existing facilities for producing artificial gas are wholly inadequate to meet the demands.

The better evidence does not support these claims. New Britain, for example, with its existing gas-making facilities is able to produce five and one-half million cubic feet of gas a day and has storage space for an additional two and one-half million cubic feet a day. The highest peak load in the history of the New Britain Gas Company was reached on January 30, 1951, a typical sub-zero New England winter's day, on which occasion the company served but two and one-half million cubic feet of gas to the entire New Britain area including domestic, industrial and commercial users. Simple arithmetic, on the basis of these uncontradicted figures, indicates that New Britain is well able to meet and exceed any present demand or any gas load which is likely to arise by consumption in the foreseeable future.

With respect to Stamford and Greenwich, the forecast is no less favorable. At the moment, Stamford is serving Greenwich the entire gas needs of the latter community—approximately two million cubic feet a day. The Stamford facilities permit production of seven million cubic feet a day, in addition to which Stamford has storage space for two million additional cubic feet each day. The highest peak load in the history of the Stamford-Greenwich operation results in one day's use of five and one-half million cubic feet, reflecting a substantial gas residue for any demand which could conceivably arise in the future. Greenwich, despite the alleged inadequacy of its supply, is about to begin to furnish gas to a new and extensive housing project; an undertaking which would seem to belie the claim of acute shortage with resulting public prejudice and distress.

The Bridgeport Gas Light Company, serving metropolitan Bridgeport, is now capable of producing fifteen million cubic feet of gas a day, in addition to which it has storage space for an eight-hour reserve supply. But once in the history of the company, during a cold peak day in the winter of 1950, was it called upon to exert its facilities to the maximum, and, on that

extreme and unusual occasion, all customers, including heavy industrial users, were fed normal gas quantities without interruption or cessation.

Heavily industrialized Bridgeport, throughout World War II, was serviced by the Bridgeport Gas Light Company without the slightest difficulty at a time when industrial gas users were engaged almost wholly in government or government-supporting production for an all-out, total and absolute shooting war No comparable situation exists at this time. Singer Manufacturing Company, whose production in 1943 was virtually 100 per cent war effort, is now reduced to 31 per cent of dollar value of production for the United States government. Bassick Company, again a 100 per cent war producer in World War II, has dropped its government or defense production to 35 per cent; and Bridgeport Brass Company, the largest single user of gas in the Bridgeport area, has reduced its gas consumption from fifty-five million cubic feet a month during the peak war year of 1943 to its present use of thirty-one million cubic feet a month.

The situation with respect to industrial use of manufactured gas is paralleled in the commercial and domestic fields and the evidence negates completely any possibility or probability of crippling shortages in business houses or homes.

Analysis of production and consumption figures makes evident the irrefutable fact that there is an abundant reservoir of manufactured gas for all legitimate and necessary uses and there is nothing to suggest public emergency or prejudice or possible hardship during the winter of 1951-1952.

It must be understood by the parties to this litigation and by the public that this decision in no way deprecates natural gas as a modern rich fuel of extreme utility. I have no doubt but that its heating properties are greater than those found in artificial gas; that it is a cleaner, less noxious and less expensive commodity; and that its eventual use in Connecticut may well prove a boon to industry and commerce and home owners. However, its introduction to the state must follow an orderly and legal course and it cannot be imported under the guise of "emergency," when, in fact, there is no urgency or crisis or public prejudice to be occasioned by temporary delay. It can be said unequivocally that there is no unfulfilled gas need in Connecticut or in Fairfield County to which any reputable fuel engineer would extend professional recognition.

Were the petitioning company granted permission to enter immediately on the lands of the respondents, the result, viewed in all its practical aspects, would be an irrevocable denial of the property owners' rights to a judicial review of their substantial claims of fact and law. Company executives have testified that they are prepared, almost instantly, to order crews of workmen on the affected properties with an assortment of mechanical equipment to prepare the land for the early laying of gas pipes. Such a move, were it to bear the sanction of a judicial order, would work complete havoc with the properties and the rights of the parties, and, between this date and the reconvening of court in the fall, the actual physical destruction of the lands would have been accomplished; the gas lines would have been laid; an incalculable amount of damage would have been done; the property owners would have been reduced to a wholly helpless state; and legal rights, which are now real, would have been converted to empty academic claims. There is no emergency warranting such an unhappy and inequitable result.

Since the public interests will not be prejudiced by delay, the petitioner's applications for immediate possession of the respondents' properties must be and are denied.