THE STATE OF CONNECTICUT *vs.* JOHN J. MCCOOK, EXECUTOR, ET AL.

* First Judicial District, Hartford, May Term, 1929.

WHEELER, C. J., MALTBIE, HAINES, HINMAN AND BANKS, JS.

* Transferred from the Second Judicial District.

Argued  May  21st—decided  July  25th,  1929.

*Hugh M. Alcorn* and *Charles Welles Gross,* for the appellants (defendants).

*Arthur M. Brown,* for the appellee (plaintiff).

WHEELER, C. J. The applicable part of the Act upon which the petition in this action is based we quote in the footnote. It is designated by the State as a Special Act and is printed among the Special Acts. If the purpose of the Act is to provide for the acquiring of land for the tuberculosis sanatorium at East Lyme it is, as we would take judicial notice, a Public Act since the sanatorium is an institution of the State for the care and alleviation of all persons within the State afflicted with tuberculosis, without discrimination.

Neither in form or substance does this Act resemble the ordinary grant of the exercise of the power of eminent domain. The petition presumably assumes the legislative determination as to the taking of the land described in the Act and the necessity therefor. It does not pray for the appointment of a committee to

---

AN ACT PROVIDING FOR THE ACQUIRING OF LAND FOR THE TUBERCULOSIS SANATORIUM AT EAST LYME.

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. The sum of thirty-five thousand dollars, or so much thereof as may be necessary, is appropriated for the purpose of acquiring, by condemnation proceedings or otherwise, for the site of the tuberculosis sanatorium at East Lyme, land located at East Lyme, bounded and described as follows: . . . [Here followed a detailed description of the land.]

Sec. 2. The governor is authorized to appoint an attorney at law for the purpose of carrying into effect the provisions of this act.

Approved, June 22, 1925.

determine the just compensation to be paid for the land taken, but prays that the amount to be paid to the owners of the land be determined. The judgment recites that the action came to the court for the appointment of a committee to determine the amount to be paid the owners of the land and the appointment of the committee, together with a specification of their duties.

The petition merely recites, the possession and occupation of certain land and buildings as the site of a tuberculosis sanatorium, an institution used and operated by the State for the benefit of the public of the State; the terms of the Act, the location of the land described in the Act as adjoining the land of the State and that it is necessary for the use of the sanatorium; the appointment by the Governor under the Act of an attorney for the purpose of carrying into effect the provisions of the Act and that the attorney cannot agree with the owners upon the amount to be paid them. The demurrer to the petition raises most of the questions which are contained in the reasons of appeal. The defendants-appellants place the greatest emphasis upon their claim that this Act is not an exercise of the power of eminent domain, but is solely an appropriation Act coupled with the appointment of an attorney to carry out the provisions of the Act. In form the Act purports to be an appropriation Act. It does not contain an express provision for the taking, as is usual, nor an express declaration of the necessity for the taking, nor one that it is to serve a public use. It does not provide a method of procedure for ascertaining, either by the terms of the Act or by reference to the procedure designated in another Act, the just compensation to be paid for the land. It appropriates $35,000, or so much as may be necessary, for the acquiring, by condemnation or otherwise, of about five

acres, which it specifically describes, thus limiting the maximum of the award in the condemnation proceedings to the amount named. While it authorizes the appointment of an attorney for the purpose of carrying out the purposes of the Act, it does not provide for him a procedure of action, nor authorize him to secure the appointment of a committee by a proper court to determine the just compensation to be paid for the land taken. Considerations such as these go far in support of the defendants' contention that this Act is nothing more than an appropriation Act. As we analyze this Act, anomalous as it is, we find in two essential particulars that it says, by necessary implication, that which the defendants insist the Act must assert by express declaration. These distinguish it from an appropriation Act and characterize it as an Act in the exercise of the power of eminent domain. The specified purpose of the Act is the acquiring, by condemnation or otherwise, of described land for the tuberculosis sanatorium at East Lyme. This is an institution of the State under a State commission, engaged in the public work of establishing homes for the care and treatment of persons suffering from tuberculosis and, as necessity arises, charged with the duty of erecting in locations of their designation sanatoria for the care and treatment of such persons. General Statutes, §§ 2638 and 2639. The land for which the appropriation in the Act before us is made is to provide additional area for the site of the sanatorium at East Lyme. The public purpose is manifest. It meets the tests we applied in *Connecticut College for Women v. Calvert*, 87 Conn. 421, 88 Atl. 633, since the purpose is public or governmental in its nature and the institution is administered for the benefit of the public without discrimination. The legislative appropriation is for the specified public purpose of acquiring, by con-

demnation or otherwise, a fully described and specified tract of land for the site of the already established sanatorium. This constituted a legislative determination to take this land and of the necessity for the taking. The determination of the necessity must be made by the legislature either itself or by some body or persons to whom it delegates its own power of making this determination. *Water Commissioners* v. *Johnson,* 86 Conn. 151, 157, 84 Atl. 727. Under the general practice the legislature determines that there is necessity for the exercise of the power of eminent domain; but it may, as it has power to do, designate the particular property or rights to be taken. 2 Nichols on Eminent Domain, Vol. 1 (2d Ed., 1917) § 333. In *Water Commissioners* v. *Johnson, supra,* we say: "In the present case the legislature determined the question only to the extent of deciding that there was a necessity which justified the grant of power made. It did not, as it occasionally does, go further, and designate any particular source from which the city's water-supply might be drawn, or the defendants' properties and rights as being subject to appropriation, and thus, either directly or indirectly, pass upon the question of a taking of the waters of Stony Brook, or of an appropriation of the defendants' . . . properties." When the property to be taken, or its location, or source, is designated within reasonable bounds, the legislative designation is final. The exercise of this power is political in character. "This determination is conclusive unless and until it is successfully attacked for unreasonableness, bad faith or abuse of power." *Water Commissioners* v. *Manchester,* 89 Conn. 671, 679, 96 Atl. 182; *Water Commissioners* v. *Johnson, supra,* at page 159. Every taking *in invitum* of private property is subject to judicial determination whether the taking falls within the prescribed limitation—whether

in truth it is founded upon public necessity. The occasion for the exercise of this power, the exigency of the occasion, and the necessity are for the legislature, as well as the determination of whether the public welfare requires or justifies its exercise, but when the taking has been ordered the fixing of the compensation is a judicial question. *Enfield Toll Bridge Co.* v. *Connecticut River Co.,* 7 Conn. 28. "The characteristics of such an act of appropriation are known and well understood. It must appear that the government intended to exercise this high sovereign right, by clear and express terms, or by necessary implication, leaving no doubt or uncertainty respecting such intent." *Boston & Lowell R. Corp.* v. *Salem & Lowell R. Co.,* 68 Mass. (2 Gray) 1, 36, 37. The purpose in the Act before us is the acquiring, by condemnation, a defined tract of land for a State institution which is open to the public without discrimination. The intention of the legislature to take this land and its intention that its legislative Act should express the necessity for the taking are, as it seems to us, as necessarily implied as though they had been directly expressed in suitable words.

These conclusions make it impossible to hold this Act to be a mere appropriation Act.

Two other attacks are made upon the validity of this Act as an exercise of the power of eminent domain. In taking these up we should have before us certain principles which are applicable to all statutes which provide for the taking of land by right of eminent domain. "Where the land of an individual is taken *in invitum* for public use, under the provisions of positive law, every requisite of the statute must be complied with, and this must appear on the face of the proceedings for taking the land." *Crawford* v. *Bridgeport,* 92 Conn. 431, 435, 103 Atl. 125.

The authority to condemn will be strictly construed in favor of the owner of the property taken and against the condemnor and the authority must be strictly pursued. 2 Lewis on Eminent Domain (3d Ed., 1909) §§ 387, 388; *In re Poughkeepsie Bridge Co.*, 108 N. Y. 483, 490, 15 N. E. 601: "No statute, however, can avail to justify the taking of private property for public use without just compensation." *McKeon* v. *New York, N. H. & H. R. Co.*, 75 Conn. 343, 346, 53 Atl. 656. "Public necessity may justify the taking, but cannot justify the taking without compensation." *Platt Bros. & Co.* v. *Waterbury*, 72 Conn. 531, 551, 45 Atl. 154. The statute authorizing the taking must itself provide the means of securing just compensation, or compensation must be provided in some other statute forming a part of it, or whose procedure for obtaining compensation has become by reference, or by the general law, a part of the Act of taking, or provision must be made under the general law for obtaining compensation which is applicable to all Acts of taking land *in invitum.*

The Supreme Judicial Court of Massachusetts, in *Boston & Lowell R. Corp.* v. *Salem & Lowell R. Co.,* 68 Mass. (2 Gray) 1, 36, 37, expressed the controlling principle in these terms: "It must appear that the government intends to exercise this high sovereign right, by clear and express terms, or by necessary implication, leaving no doubt or uncertainty respecting such intent. It must also appear, by the Act, that they recognize the right of private property, and mean to respect it; and under our Constitution, the Act conferring the power must be accompanied by just and constitutional provisions for full compensation to be made to the owner."

In the Act under which this proceeding was brought the sum of $35,000, or so much thereof as may be nec-

essary, is appropriated. If just compensation for the land taken exceeds the amount appropriated, no means of meeting the excess is provided in the Act or in the general law. This falls short of the indispensable requirement that the statute must conform to the constitutional requirement. Appealing to the known resources of the State does not provide the just compensation which the Act must provide. Constitutional provisions must be followed; they cannot be ignored.

In *Connecticut River R. Co.* v. *County Commissioners*, 127 Mass. 50, at pages 55 and 56, the court said: "It is sufficient that the statute which authorized the taking of the property should provide for the assessment of the damages in the ordinary manner, and direct that the damages so assessed be paid out of the treasury of the Commonwealth, and authorize the Governor to draw his warrant therefor; . . . But in the statute before us there is no pledge of the faith and credit of the Commonwealth, no appropriation of the general funds in its treasury, and no authority to the Governor to draw his warrant for the payment of the damages out of such funds. On the contrary, the very terms of the statute preclude the inference of any such pledge, appropriation or authority, by directing that the land taken for the union passenger station shall be paid for from the earnings of the Troy and Greenfield Railroad and Hoosac Tunnel, and appropriating for the purposes of the Act a sum not exceeding nine thousand dollars to be paid out of those earnings. St. 1878, c. 277, §§ 6, 8. The fact, admitted by the parties, that those earnings will probably be sufficient to meet and extinguish all claims for damages for lands so taken, falls short of satisfying the requirement of the Constitution that the owner of property taken for the use of the public shall have a prompt

and certain compensation, without being subject to any risk or unreasonable delay."

The Act does not make another statute providing a procedure for obtaining compensation a part of it directly or by reference. Nor is there any general law of the State prescribing the method for ascertaining just compensation. General Statutes, § 5186, is not applicable. In *Thomson* v. *New Haven*, 100 Conn. 604, 606, 124 Atl. 247, the claim was made that the charter of New Haven did not give the right to condemn and therefore the city must proceed under § 5186. "This," we said, "is a mistaken theory. Section 5186 is not a statute of general application. Its application is in terms restricted to the condemnation of land for the particular purposes set forth in certain other sections of the statutes, each of which is identified by its number." If this section were a statute of general application providing a procedure for obtaining compensation in condemnation actions and this Act, by reference, made its procedure a part of the Act, or the law made its general procedure applicable to all actions taking land by eminent domain no question could be fairly made that the Act failed in not giving a procedure for ascertaining the just compensation. But it neither does nor attempts to do this. And § 5186 is not, as we have held, a statute of general application, but one applicable to the specified purposes designated in §§ 5177, 5178, 5179, 5180, 5181 and 5187 of the General Statutes. These sections are in substance similar to § 5178, which reads: "Any county may take any land which its commissioners deem necessary for the site, or for an addition to the site, of any county building."

Given no procedure to follow and no method for determining the just compensation to be awarded for the land to be taken, the attorney appointed to carry

out the purposes of this Act instituted this action apparently upon the theory that he might adopt the procedure specified in § 5186, but prayed, only, that the amount to be paid the owners of this land might be determined. The trial court under this prayer and with no procedure outlined in the Act rendered its judgment in the usual form when a proper procedure is outlined in the Act of condemnation and appointed a committee to assess in favor of the owners of the land just compensation for the taking and report its doings to the court. Neither the attorney nor the trial court acted within their authority, for no valid taking by eminent domain was given by this Act. Its purported grant of authority to acquire by condemnation proceedings the land described in the Act was wholly inoperative. Its further grant authorizing the acquiring of the described land by purchase or the agreement of the parties in interest was a valid grant of authority and operative. 2 Lewis on Eminent Domain (3d Ed., 1909) § 673, states the principle involved with accuracy we believe when it says: "Statutes which provide for a condemnation of private property, and fail to provide compensation therefor, have sometimes been spoken of as void. This is probably, however, a mere inadvertence of expression. Such Acts would simply be inoperative so far as the power to condemn property is concerned, but might be carried into execution by the purchase of the requisite property, or aided by a subsequent Act supplying the defect."

The tuberculosis commission—in fact the directors of a State institution—desiring to take property when it cannot agree with the owner upon the amount to be paid him for the property have authority under § 5186 to prefer its petition to the Superior Court in the name of the State and have the matter determined

in accordance with the procedure outlined in that section. We are without judicial power to conclude that an Act of condemnation can be legally operative which ignores the time honored judicial procedure for taking property by eminent domain and provides no means for determining just compensation for the property taken.

Subsequent to the overruling of their demurrer to the complaint the defendants filed an answer. The plaintiff filed its motion to strike out the allegations of the answer which were new matter, because ten of the paragraphs of the answer are legal conclusions or repetitions of averments in the demurrer to the complaint, and because eighteen paragraphs and part of another paragraph are irrelevant, immaterial and frivolous. Thereafter the plaintiff filed a demurrer to the ten paragraphs averred in the motion to be legal conclusions upon the same ground and as to the other nineteen paragraphs of the answer referred to in the motion as irrelevant, immaterial and frivolous, it demurred because the court had already decided that the Act under which these proceedings are brought determined the necessity for the taking, leaving the sole question for judicial determination the compensation to be paid as to which these paragraphs of the answer have no bearing. The demurrer was rightly sustained as to paragraphs one, two, three, four, twenty-six, the last half of twenty-eight, twenty-nine, thirty-two, thirty-four and thirty-five. Legal conclusions have no place in an answer.

To pass upon the demurrer to the other paragraphs requires us to give a summary of their allegations which we regard as relevant to several defenses which they apparently raise: The petition alleges and the defendants admit that the State owned on June 25th, 1925, and ever since has owned certain land and build-

ings in East Lyme as the site of a tuberculosis sanatorium, an institution used and operated for the benefit of the public of the State. The answer alleges that the land sought to be taken has a frontage of about four hundred and fifty feet on a sandy beach on the shore of Long Island Sound, suitable for a bathing beach, and indispensable to the use and enjoyment of the property and the chief element in its value. The taking of three hundred and ninety-one feet of the beach would greatly lessen the value of the entire tract and cut off access from the remaining property to the beach and destroy its value as shore property. In 1918 the State acquired an old wooden structure formerly used as a hotel located on land adjoining that sought to be taken; these are used for the treatment of children afflicted with glandular and bone tuberculosis. The land of the State is four hundred feet in depth and amply sufficient to accommodate a large fireproof sanatorium building. It has ninety-seven feet of frontage on a broad sand beach and is adapted for a bathing beach and for other purposes of the sanatorium and amply sufficient for all of its needs. For a long time prior to the institution of this action other property in this vicinity fronting on a bathing beach has been and now is available by purchase. The defendants since the State acquired this property have been and still are willing that the children in the sanatorium should use their bathing beach and the children have used it both above and below high-water mark. In 1923 this commission in asking the General Assembly for an appropriation represented that its land was ample for this fireproof building. The appropriation was then granted, but the building has never been begun. On June 14th, 1922, a member of the commission wrote in its behalf to one of the defendants asking if it were possible to purchase any part of their

property and in reply defendants notified him their property was not for sale. At the opening of the session of the General Assembly in January, 1923, a bill was introduced authorizing the commission to buy all of defendants' land, and if unable to agree with the owners, authorizing it through the Attorney General to condemn the same in the name of the State, and directing him to proceed as provided in § 5186 of the General Statutes and appropriating $100,000, or so much thereof as may be necessary, to carry out the provisions of this Act. The bill was rejected. Subsequently a substitute bill was reported to the House of Representatives directing the commission to purchase a part of defendants' land, being about one half of its area and one half of the beach frontage; in the event that the commission should be unable to agree with the owners, directing it through the Attorney General to institute condemnation proceedings to acquire the described land under the provisions of § 5186. The substitute bill failed of passage. Meanwhile an appropriation bill was passed and approved appropriating $25,000 for the purpose of acquiring land adjoining the site of the sanatorium and directing the commission to acquire in the name of the State such land as the commission may require for such purpose. This bill has never been repealed and is now in full force. During the session of the General Assembly of 1923, the commission made an agreement with defendants, through the medium of the Governor, that, without monetary consideration, they would deed to the State not more than sixty feet in width of the land sought to be condemned, upon the express condition proposed by the commission that it would refrain from attempting thereafter by condemnation proceedings to acquire any of defendants' land. The agreement is embodied in a letter of March 19th, 1923, from the

commission by its chairman to the Governor, which states: "1. If the owners of the McCook property at Niantic, will sell to the State the small section of their property, approximating fifty feet wide that adjoins the Seaside and that lies west of the ravine on the McCook property, they will greatly facilitate our planning for our new construction at the Seaside. This small knoll of land has been by nature separated from the main part of the McCook property." "2. We commit ourselves to refrain from attempting by any condemnation proceedings or other forcible measure for securing for the State this or any other portion of the McCook property."

The defendants' reply of April 16th, 1923, accepted the proposal of the commission and submitted a draft of a deed which the then executor stated he was willing to execute for the benefit of the State, upon authorization by the General Assembly. The deed grants a tract sixty feet in width instead of fifty as proposed by the commission. The letter states: "We decline, however, to accept any monetary compensation, since from the outset we have had just one purpose—to defend ourselves from aggression. . . . Finally, since it is not a question of dollars and cents with us, let me point out that the only consideration for the deed is that embodied in the commission's proposal, namely freedom in future from molestation." The above reply was transmitted to the commission whose chairman and members were then and now are the same. The agreement was consummated before the bill of June 2d, 1923, was passed and approved.

In the latter part of 1924 the Attorney General instituted, in the name of the members of the commission and the comptroller of the State and at their direction, an action against one of the defendants as executor of the will of Eliza A. McCook to condemn a

portion of defendants' land having a frontage on the beach of about two hundred feet. This action was withdrawn by the Attorney General by direction of the commission on September 17th, 1925, the day before the present action was begun. Prior to the action begun in 1924 the commission voted, in order to carry out the purposes of the Act of 1923, that the commission required the land proposed to be condemned in the action of 1924. This vote is still in effect.

At the session of the General Assembly of 1925, after the expiration of the time limited for the presentation in the House and Senate of bills and resolutions, the Committee on Humane Institutions, without notice or hearing, originated and reported to the House of Representatives on May 14th, 1925, a bill authorizing the commission to employ an attorney under the Act of 1923, to acquire land for the tuberculosis sanatorium and making an appropriation of $3000 to carry out the Act. The bill was on June 2d, 1925, rejected.

On May 27th, 1925, the Committee on Appropriations, without notice, citation or hearing, reported the bill which is the Act upon which the present action is based. The bill was prepared outside of the committee and was not introduced and referred in the usual way. It passed both Houses on June 1st, 1925, but was not signed by the Governor before the final adjournment of the General Assembly on Wednesday, June 3d, 1925, nor within three days, Sundays excepted, after the final adjournment thereof and not until nineteen days thereafter. No attempt was made by the attorney appointed under this Act to agree with the defendant owners as to any terms of conveyance or compensation, nor has the commission communicated with defendants except through the medium of condemnation proceedings since the making of the above agreement.

The defendants at all times have been and now are

willing, have offered and now offer, to convey to the State in accordance with the terms of the agreement the sixty feet of land referred to in the agreement.

The court sustained the demurrer, holding that the sole question at issue was the determination of the compensation to be paid and that the new matters alleged in these paragraphs have no bearing upon the determination of that. The defendants renewed in their answer a ground of their demurrer to the complaint that the Act was not signed by the Governor until nineteen days after the final adjournment of the General Assembly on June 3d, 1925. The court was justified in ignoring a defense which had already been adjudicated on demurrer.

The defendants also claim that these allegations of the answer show that the taking is not in good faith and is an abuse of power and unreasonable. They claim further in defense that the history of this matter discloses a line of pursuit which is nothing less than vexatious. These claims are based upon a principle of law which this court fully recognizes. We express in *Water Commissioners* v. *Johnson*, 86 Conn. 151, 159, 84 Atl. 727, the principle in these terms: "Many cases in other States have expressed this latter view, and held what we regard the better law, that the decision of the condemnor that a necessity exists for the taking of particular property is one open to judicial review to discover if it was unreasonable, or in bad faith, or an abuse of the power conferred, and that the appropriation of the property will be restrained if it be found that such was the character of the decision." See also *Water Commissioners* v. *Manchester*, 89 Conn. 671, 679, 96 Atl. 182. We find no occasion to determine whether these defenses could withstand a proper demurrer to them. They have never had their day in court. The demurrer filed by the plaintiff to the an-

640

swer did not attack these defenses. The trial judge in sustaining the demurrer confined his attention to the ground of the demurrer which had no relation to the defenses the defendants attempted to plead. Judgment could not have been legally rendered until these defenses were legally disposed of.

There was too, upon the allegations of the answer, an opportunity to claim bad faith in these proceedings because of the breach of a claimed legal agreement by which the defendants agreed to give to the State a strip of land sixty feet in width and of the depth of the tract claimed to have been taken upon consideration of the agreement of the commission to refrain from attempting by any condemnation proceedings to secure for the State either the sixty foot strip or any other portion of the defendants' property. Again we find no occasion at this time to pass upon this question of good faith on the part of the State tuberculosis commission, but certainly the defendants are entitled to establish these facts by proof, if they can, and then to have the opportunity of making all reasonable claims of law upon the facts proven.

The history surrounding this matter presents a very unusual and even an extraordinary situation which the trial court ought to have disposed of upon the merits before granting the relief prayed for.

There remains the constitutional question raised by defendants' demurrer to the complaint and renewed in their answer, that the Act is void because not approved by the Governor until nineteen days after the final adjournment of the General Assembly. The provision of the Constitution which defendants urge was violated by the approval of this Act more than three days after the final adjournment of the General Assembly is § 12 of Article Fourth, which reads: "Every bill which shall have passed both houses of the General

Assembly, shall be presented to the Governor. If he approves, he shall sign and transmit it to the Secretary, but if not, he shall return it to the house in which it originated, with his objections, which shall be entered on the journals of the house; who shall proceed to reconsider the bill. If after such reconsideration, that house shall again pass it, it shall be sent, with the objections, to the other house, which shall also reconsider it. If approved, it shall become a law. But in such cases the votes of both houses shall be determined by yeas and nays; and the names of the members voting for and against the bill, shall be entered on the journals of each house respectively. If the bill shall not be returned by the Governor within three days, Sundays excepted, after it shall have been presented to him, the same shall be a law in like manner as if he had signed it; unless the General Assembly, by their adjournment, prevents its return, in which case it shall not be a law."

It must be conceded that the construction of the last six lines of this section presents a difficult problem. The State insists that the practical construction accorded this language by all of the Governors since 1919 in signing both Public and Special Acts more than three days after the final adjournment is strongly indicative that this course was the correct one. It is true that "long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character." *Okanogan, etc., Indian Tribes* v. *United States,* 49 Sup. Ct. 463, 469, decided by the Supreme Court of the United States May 27th, 1929. While such a practice is not binding on this court it is, we say in *State ex rel. Corbett* v. *South Norwalk,* 77 Conn. 257, 264, 58 Atl. 759, "entitled to great regard in determining the true construction of a constitutional provision the phraseology

of which .is in any respect of doubtful meaning." In this instance this consideration—claimed in behalf of the State—is not applicable, since the period of the practice relied upon has been only since 1919—a far too short period upon which to predicate a settled and established practice. Especially is this true in the light of the fact, undisputed in this case, that from 1877 to 1919 all Public Acts were signed by the Governor within three days of the final adjournment, except in the year 1882, when four were signed by the Governor more than three days after the final adjournment, while all Special Acts from 1877 to 1919 were signed prior to the expiration of the three days following the final adjournment, except four in 1883, one in 1909, and five in 1913, ten in all of this period. Forty-two years was a sufficient time for the growth of that long and established practice which entitles it to great regard in determining the construction of the constitutional provision before us. The State advances two other considerations in support of its contention that the Governor has the power to sign a bill after the expiration of the three-day period. Its representative asserts that "this section of the Constitution simply provides in effect that no bill shall become a law unless signed by the Governor, except that when the General Assembly is in session a bill shall become a law without the Governor's signature if he fails to return it to the General Assembly within three days after its presentment to him." The State relies upon the fact that there is nothing in this constitutional provision which provides that after the expiration of the three-day period following the final adjournment of the General Assembly bills presented to the Governor shall not become laws if approved by him. This construction, the attorney for the State frankly avows in argument and brief, necessarily leads

to the conclusion that there is no specified time in which the Governor must sign these bills in order to make them laws. That is, he may sign the bill at any time prior to the beginning of the session of the next General Assembly. If he can sign one bill on the last secular day preceding the next General Assembly he can on that day sign all bills presented to him on the final adjournment of the General Assembly. That situation would be intolerable. "It is of the first importance that the people should know to what law they are subject." *State ex rel. Corbett* v. *South Norwalk,* 77 Conn. 257, 261, 58 Atl. 759.

No instance has been presented to us, and we find none, where the approval of laws is made subject, as to the time of approval, to the unlimited discretion of a Governor. No Constitution of any of our States commits to the unlimited discretion of the Governor such a determination. Under a constitutional government the law of the land can never be dependent upon the unrestricted discretion of any official, be the office he holds ever so high. The fact that no Governor has taken longer than sixty days in which to perform his constitutional duty in signing bills after the final adjournment of our General Assembly and that Connecticut people can trust to our Governors not to abuse their power, is a species of protection against abuse of power which neither our Constitution nor our law can recognize.

The final consideration which the State presses upon us is that if this constitutional provision is so construed as to prevent the signing of bills by the Governor more than three days after the final adjournment of the General Assembly very many Special Laws under which public and private corporations and individuals have trustfully acted will be voided. No court could fail to realize the consequences such a

construction would involve, and that realization would lead it to give the most careful investigation and its best thought to a matter of this character. If the conclusion reached could not avoid these disastrous consequences it would but declare the voice of the law, although it would have no part in the responsibility of having aided in the creation of the situation which it would deeply deplore.

We turn now from a discussion of the claims of the State to a discussion of those of the defendants. This constitutional provision was undoubtedly drafted from the similar provision found in § 7 of Article First of the Constitution of the United States; the characteristic differences in the two provisions are in the period provided for the return of bills, ten days in the Federal Constitution against three in the State Constitution, and in the provision requiring in the Federal Constitution two-thirds of each house to pass a bill which the President has returned for reconsideration, while our State Constitution requires a majority only to pass a bill over the Governor's veto.

There is no Federal decision of the United States Supreme Court upon the precise point we are considering. It has been held that an Act of Congress presented to the President while Congress was sitting and signed by him when Congress was in recess for a specified time, but within ten days, Sundays excepted, after it was so presented to him, immediately upon its signing became a law. *La Abra Silver Mining Co.* v. *United States,* 175 U. S. 423, 20 Sup. Ct. 168. It was also held in *Okanogan, etc., Indian Tribes* v. *United States,* 49 Sup. Ct. 463, decided by the Supreme Court of the United States May 27th, 1929, where an interim adjournment of Congress having been taken at the end of the first session, as a result of which, although the legislative existence of the house in which the bill

originated has not been terminated, the President is prevented from returning it to such house, that in consequence the bill did not become a law. It was also held that the same rule would apply in the case of a final adjournment. Only one President, so far as we are informed, has signed bills after the adjournment of Congress but within ten days after the presentation of the bills to him. President Wilson did this on the advice of the Attorney General. His innovation is approved of in an article in 30 Yale Law Journal, page 1, entitled "The Power of the President to sign Bills after Congress has Adjourned," by Professor Lindsay Rogers.

The practical construction placed upon the Federal Constitution corresponds with that which was accepted and followed unquestioned, as to our related constitutional provision, certainly up to 1919. In view of the language of *Okanogan, etc., Indian Tribes* v. *United States, supra,* it may well be questioned whether the Supreme Court of the United States will give its approval to the practice inaugurated by President Wilson. However, we think it cannot be doubted that it will not construe this section of the Federal Constitution so that it may grant to the President the power to sign bills more than ten days after the final adjournment of the Congress.

The provisions of the constitutions of three of the States are so similar to the provision of our own Constitution under consideration as to make decisions thereunder of pertinent applicability. In Illinois the provision is as follows: "Unless the General Assembly shall, by their adjournment, prevent its return; in which case, the said bill shall be returned on the first day of the meeting of the General Assembly after the expiration of said ten days, or be a law." In *Seven Hickory* v. *Ellery,* 103 U. S. 423, a bill was presented

to the Governor and signed by him after the legislature had adjourned but within ten days after its presentation to him. "The single question we have now to consider is whether a bill passed by both houses, and presented to the Governor before the legislature adjourns, becomes a law when signed by the Governor. after the session of the legislature has been terminated by an adjournment, but within ten days from its presentation to him. We have no hesitation in saying it does. There is certainly no express provision of the Constitution to the contrary. All that instrument requires is that before any bill, which has passed the two houses, can become a law, it shall be presented to the Governor. If he approves it, he may sign it. If he does sign it within the time, the bill becomes a law. That is not said in so many words, but is manifestly implied. After a bill has been signed, the legislature has nothing more to do with it." The provision in the New York Constitution adopted in 1821, followed in its related provision (Article First, § XII), in substance, the latter part of the language of our § 12 of Article Fourth, viz: "If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the legislature shall, by their adjournment, prevent its return; in which case it shall not be. a law."

In his opinion in *People* v. *Bowen*, 21 N. Y. 517, 520, Judge Denio wrote: "I think he [the Governor] would not be justified in acting upon a bill after his ten days had elapsed, whether the session continued or not." In *Solomon* v. *Commissioners of Cartersville*, 41 Ga. 157, it was held that a bill signed by the Governor two months after the adjournment of the legislature did not become a law. The language, "unless the

General Assembly, by their adjournment, prevents its return, in which case it shall not be a law," in the light of the practical construction accorded this language from 1877 to 1919, may be construed, by implication, as if containing the additional words, "unless it be signed within the above three days, Sunday excepted, period." It has been so construed in most of the cases which have expressed an opinion on this point as to similar constitutional provisions in other States. In *Hartness* v. *Black*, 95 Vt. 190, 201, 114 Atl. 44, the court said: "We come to the question whether the Constitution permits the Governor to give his assent to a bill which is presented to him after the legislature has adjourned. The question has not often arisen, and there is not entire harmony in the decisions. The petitionee argues that it would be against public policy to permit this to be done, as there would be no limit to time within which such bills would become laws, resulting in serious confusion. But we have already held, as do practically all the courts where the question has arisen, that the Constitution limits the time within which the Governor may give validity to a bill by signing it to a period of five days (Sundays excepted) from the time it is presented to him." See also 37 L. R. A. 391, note.

The reading of the debates of the Connecticut Constitutional Convention of 1902, page 2283 *et seq.*, fairly indicates that neither that body nor the eminent lawyers and distinguished publicists among its membership entertained the idea that the Governor had power to sign bills more than three days (Sundays excepted) after the final adjournment of the General Assembly. It is interesting to note that Attorney General Phelps failed in his attempt to substitute for "days" in this provision "legislative days." Later this court by its construction gave to "days" in the case

then before it the meaning "legislative days." *State ex rel. Corbett* v. *South Norwalk,* 77 Conn. 257, 58 Atl. 759. As the debate progressed, Delegate Brown of Norwich offered a motion, originally suggested by Governor Waller and approved by Delegate Lewis Sperry, substituting ten days for three days in the provision now under discussion. The definitely expressed reason given for this action was to give the Governor time to pass on bills presented to him before or at the time of the final adjournment. In *State ex rel. Corbett* v. *South Norwalk,* 77 Conn. 257, 262, 263, 58 Atl. 759, a bill which originated in the House was passed by the General Assembly and presented to the Governor. The House adjourned for more than three calender days (Sundays excepted) after its presentation to the Governor, so that he was unable to return it within three calendar days. Under these conditions we held that the term "three days" as used in § 12 of Article Fourth of the Constitution must be read with due reference to the context and "cannot have been employed to denote in all cases three calender days," but means "three days during each of which there is an opportunity to return a bill to the house in which it originated while . . . in actual session." Three legislative days might necessarily mean a period longer than three calender days, but must include the three calender days. The General Assembly, by its final adjournment, ended all legislative days, but it left a part of the three legislative days operative, namely, the three calendar days. Under the construction outlined the intention of the framers of this section will be carried out and the violation of constitutional principle avoided by requiring that bills presented to the Governor may not be signed by him more than three days (Sundays excepted) after the final adjournment of the General Assembly.

We leave the discussion of the constitutional point

involved with a brief presentation of two considerations which are of most serious import. If the Governor has power under the Constitution to determine the precise moment when each and every Act, presented to him and unsigned by him within three days of the final adjournment of the General Assembly, shall become effective as a law, grave public abuse might follow the possession and use of this extraordinary power.

From 1850 down to the present time the General Assembly has designated the day when Public Acts shall become laws. Its power so to act has never been, as far as we can discover, publicly challenged. If the Governor can determine by his own will when Public Acts shall become laws his will will override the long-exercised power of the General Assembly. Their exercise since 1850 of this power is compellingly suggestive of a legislative construction as denying to the Governor the power to sign Acts of the legislature at any time at his discretion and as construing the Constitution as denying him the right to sign legislative Acts more than three days after the adjournment of the General Assembly. The construction accorded this provision of the Constitution, in conformity with the long-settled practice of the executive and legislative departments of our government, is not only convincingly persuasive, but almost controlling upon the construction to be given the same constitutional provision by the judicial department.

We have thus considered the chief arguments in favor of the construction giving to the Governor the power to sign bills presented to him, after the three-day period, and those opposed to according him this power. We recognize the gravity of the public situation if the Governor is denied this power, but we are obliged to hold, for the reasons stated, that Acts signed after the three-day period, whether Public or Private,

are void. The burden imposed upon the Governor of having a very considerable percentage of all bills passed at the session of the General Assembly presented to him after its final adjournment—many of these the most important of the session—literally prevents his fair consideration of the merits of this mass of legislation within the constitutional three-day period. If he signs all of these bills the people may be deprived of the Governor's considered view of these measures and the constitutional check upon hasty, ill-considered and publicly inimical legislation removed by the pressure of the burden placed upon the Governor. On the other hand, bills which the Governor does not sign, however meritorious they may be, will fail to become laws. The avoidance of this untoward public situation is neither hard to see nor difficult to enforce. A better distribution and a prompter disposition of the business of the General Assembly and the avoidance of leaving the most important bills to the closing days of the session will not only relieve the Governor from the burden of a duty which is impossible of proper performance, except under most exceptional circumstances, but will also tend to give the General Assembly the opportunity for more extended consideration of important measures. A recess taken by the General Assembly, after it is through with its business, of ten days, would give the Governor the opportunity of fairly considering bills presented to him, and give the General Assembly the opportunity of reconsidering bills returned to it disapproved of by him. This course would not conflict with the power of the Governor in signing bills within the period prescribed by the Constitution after the final adjournment of the General Assembly.

There is error, the judgment is set aside and the Superior Court directed to enter judgment overruling

the plaintiff's demurrer to the answer as above set forth and sustaining defendants' demurrer to the complaint as to grounds five, seven, eight and ten.

In this opinion the other judges concurred.