J. EDWARD CALDWELL ET AL. *v.* THOMAS J. MESKILL ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, JS.

Argued December 7, 1972—decided January 24, 1973[1]

*Joseph P. Flynn,* for the named plaintiff et al., with whom were *Thomas F. Keyes,* for the plaintiff city of New Haven, and *John D. Mahaney,* for the plaintiff city of Waterbury.

*Raymond J. Cannon,* assistant attorney general, with whom were *Barney Lapp* and *Clement J. Kichuk,* assistant attorneys general, and, on the brief, *Robert K. Killian,* attorney general, for the named defendant et al.

---

[1] For records and briefs see Vol. A-566.

*Francis J. McCarthy,* with whom was *Richard R. Stewart,* for the intervening defendants Ives et al.

HOUSE, C. J. This case concerns the validity and effect of a veto message delivered by the governor in which he disapproved two sections of the 1972 September Special Session House Bill No. 8022 and its statement of purpose and provisionally approved the three remaining sections of the bill. The plaintiffs, majority leaders of the 1972 General Assembly, the president pro tempore, the speaker and the cities of New Haven and Waterbury, instituted an action seeking a declaratory judgment as to whether the veto was valid, and, if not, what was the effect of the governor's action. The defendants are the governor, the secretary of the state, the commissioner of transportation and the comptroller. The minority leaders of the 1972 General Assembly were allowed to intervene as codefendants. The Superior Court, on the request of and with the consent of all the parties and the filing of a stipulation of facts, reserved the dispositive questions to this court. This court granted a motion to expedite a hearing on the reservation.

House Bill No. 8022[2] was passed by the General

[2] [House Bill No. 8022, 1972 September Special Session]
"Section 1. The general assembly finds that certain specific motor carrier transportation facilities may be discontinued, disrupted or abandoned in whole or in part and that the discontinuance, disruption or abandonment of such facilities will be detrimental to the general welfare of the state, further that specific motor carrier facilities may not be operated in the manner required by the general welfare of the state and further, that additional motor carrier facilities may be required in the interest of the public welfare.

"Sec. 2. Notwithstanding the provisions of section 13b-35 of the 1969 supplement to the general statutes, as amended by section 12 of number 261 of the public acts of 1972, the commissioner of transportation shall proceed in accordance with the provisions of section

Assembly on September 19, 1972, and was duly presented to the governor. The statement of purpose appended to the bill indicated a legislative intention that the public service tax fund be used in the exercise of the transportation commissioner's powers under the provisions of § 13b-34 of the 1969 Supplement to the General Statutes and that the formula for the distribution of highway town aid be amended to provide for an increase in the grants to the towns. Section 1 of the bill contained a legislative finding that the operation of certain trans-

---

13b-34 of said supplement, as amended, to ensure that motor carrier transportation facilities shall be operated in the manner required by the general welfare of the state. Any agreement entered into thereunder for payments by the state shall include express provisions that no state funds received pursuant thereto shall be used for the benefit of stockholders or officers of the common carrier or be paid directly or indirectly to any of them, shall include specific provisions with respect to the proposed uses of the state funds and shall be for a period which does not extend beyond June 30, 1973. Expenditures by the commissioner in the exercise of his powers under said section 13b-34 and this act shall be charged to the resources of the public service tax fund available to the commissioner for such purposes.

"Sec. 3. In addition to the funds made available to the towns under section 13a-175a of the 1969 supplement to the general statutes for the purposes set forth therein, the additional sum of three million dollars shall be distributed pro rata for such purposes to the towns on the basis of the ratio of the population of the town to the population of the state, notwithstanding the provisions of section 13a-175b of the 1971 supplement to the general statutes. The most recent available federal decennial census shall be used to determine a town's population.

"Sec. 4. There is appropriated for the fiscal year ending June 30, 1973, from the resources of the highway fund three million dollars for the purposes of section 3 of this act.

"Sec. 5. This act shall take effect from its passage and shall terminate July 1, 1973.

"STATEMENT OF PURPOSE: To clarify the legislative intent that the public service tax fund be used in the exercise of the Commissioner of Transportation's powers under section 13b-34 of the 1969 supplement to the General Statutes, as amended, and to amend the Highway Town Aid distribution formula to provide for an increase in town grants."

portation facilities was in jeopardy, and that their operation was required by the general welfare of the state. Section 2, inter alia, directed the commissioner of transportation to exercise the authority granted in § 13b-34, as amended, of the General Statutes to ensure the operation of transportation facilities, stipulated to some extent the form of agreements to be made by the commissioner, and provided that expenditures incurred in carrying out the provisions of the enactment "shall be charged to the resources of the public service tax fund available to the commissioner for such purposes." The governor disapproved of these two sections of the bill and the statement of purpose.[3]

Sections 3 and 4 of the bill made an additional appropriation to the towns to be spent in accordance

---

[3] "[To Honorable Gloria Schaffer, Secretary of the State]

"I return herewith House Bill 8022, "An Act Concerning The Continuation of Motor Carrier Transportation Services and Increasing Highway Town Aid", with my signature, disapproving, however, Sections 1 and 2.

"In the event that this line-item veto is successfully challenged, then, and in that event, my action shall be considered a veto of the entire House Bill No. 8022.

"Since the early 1960s, several sessions of Connecticut's General Assembly have approved legislation which encourages towns to form transit districts. The state government has agreed to assist these districts by providing both the busses and the means necessary to allow the busses to operate on a break-even basis. Such an approach allows the government closest to the problems of surface transportation, local government, to develop methods of mass transit.

"Section 2 of HB 8022, on the other hand, frustrates the expressed desire of the General Assembly and the Executive to assist transit districts. This ineptly-drawn legislation doesn't even accomplish the ends its sponsors intended. The bus industry labor-management negotiations now in progress are concerned with a one-year contract. Yet this bill provides funding for only a nine-month period.

"Further, and perhaps even more incredible, although some political leaders said a special legislative session was unnecessary, they then drafted this bill which will actually limit the very authority of

with § 13a-175b of the General Statutes. Section 5 provided that the act should take effect on passage and terminate on July 1, 1973. These three sections were all approved by the governor (see footnote 2, supra) with the proviso, however, that if his veto of the first two sections were successfully challenged, then his action should "be considered a veto of the entire House Bill No. 8022."

The reserved questions,[4] distilled to their essence, are whether the governor has the power to veto some sections of the bill and to leave others intact; if not, then what is the effect of his purported conditional veto of the entire bill; and whether the secretary of the state has the duty to record and certify the entire bill.

---

the Commissioner of Transportation which they cited as making a session unnecessary. Indeed, it is very doubtful that any solution other than an outright takeover of the bus companies by the State could be effected under Section 2 of this legislation.

"HB 8022 was conceived in the heat of a political campaign. It is a bill which subordinates the long-term public good to a momentary political advantage. I cannot allow such a sham to become law in our State."

[4] "B. The questions upon which advice is desired are as follows:

"1. Under the facts as stipulated herein, does the defendant Thomas J. Meskill acting in his capacity as Governor and Chief Executive Officer of the State of Connecticut have the power under the provision of Article 4, Sections 15 and 16 of the Constitution of Connecticut, to veto Sections 1 and 2 and the Statement of Purpose of House Bill 8022 while permitting Sections 3, 4 and 5 to become law?

"2. If the answer to question 1 is No, does the defendant Thomas J. Meskill acting in his capacity as Governor and Chief Executive Officer of the State of Connecticut have the power to provide that in the event that this line item veto is successfully challenged, then and in that event, his action be considered a veto of the entire House Bill 8022?

"3. If the answer to questions 1 and 2 is No, is the defendant Gloria Schaffer, acting in her capacity as Secretary of State, required to record the entire House Bill 8022 and certify same as law?"

## I

Article fourth, § 15, of the constitution of Connecticut confers on the governor the power to veto any bill passed by both houses of the General Assembly but confers no power to veto any bill except as an entirety. *Patterson* v. *Dempsey,* 152 Conn. 431, 436, 207 A.2d 739. Article fourth, § 16, confers a limited power of partial veto in the case of appropriation bills. He may "disapprove of any item or items of any bill making appropriations of money embracing distinct items while at the same time approving the remainder of the bill." Whatever power the governor has partially to veto any bill is derived solely from article fourth, § 16, of the constitution. *Bengzon* v. *Secretary of Justice,* 299 U.S. 410, 413, 57 S. Ct. 252, 81 L. Ed. 312; *Patterson* v. *Dempsey,* supra, 437–38.

Our decision of the reserved questions is governed substantially by the recent holdings of this court in *Patterson* v. *Dempsey,* supra. In that case the court had before it a factual situation similar in many respects to the present case. The governor had vetoed several sections of a bill that included both items of appropriation and general legislation. The vetoed sections were portions of the general legislation. *Patterson* v. *Dempsey,* supra, 438. We held that even though the inclusion of general legislation in a bill also making appropriations violated § 2-35[5] of the General Statutes, the governor nevertheless had no power on the grounds of that violation to

[5] "[General Statutes] Sec. 2-35. COMMITTEE ON APPROPRIATIONS. . . . Each appropriation bill shall specify the particular purpose for which appropriation is made and shall be itemized as far as practicable. No general legislation shall be made a part of such appropriation bill."

veto the general legislation since the prohibition was statutory rather than constitutional in nature. In effect, the inclusion of both kinds of legislation in the same bill constituted a pro tanto repeal by implication. "[O]ne legislature cannot control the exercise of the powers of a succeeding legislature." *Patterson* v. *Dempsey,* supra, 439.

A further issue crucial to the disposition of the present controversy was decided in the *Patterson* case. The question was presented as to whether the governor had the power to veto any item or items in a bill which made appropriations, or whether the power extended only to specific "items of appropriations." The court held that an "item," to be subject to the power of partial veto, must in itself be a specific item of appropriation. *Patterson* v. *Dempsey,* supra, 439–43. Although there is authority in other jurisdictions to the contrary,[6] we see no reason to reverse the clear holding of the *Patterson* case. The court recognized that to some extent such a holding circumscribes the authority of the governor, but "[i]f the governor were allowed to disapprove or veto parts of a bill involving general legislation, he could, in the case of many if not most such bills, by the exercise of that power, eliminate selected portions of a bill in such a manner as to change its meaning and thereby, in effect, enact an entirely different bill. This would usurp the legislative function, which is committed to the General

---

[6] See, e.g., *Commonwealth* v. *Barnett,* 199 Pa. 161, 173, 48 A. 976; *State ex rel. Turner* v. *Iowa State Highway Commission,* 186 N.W.2d 141 (Iowa). We note in this context that many states constitutionally prohibit the intermingling of general legislation with items of appropriation. In these states, presumably, the governor may veto any section of a bill if the bill also happens to appropriate money; if the section in issue were not an item of appropriation, it constitutionally had no place in the bill.

Assembly alone. But such legislative action through the use of the veto power would be impossible if the veto power were restricted to distinct items of appropriation in a bill, whether that bill did, or did not, include other items of general legislation." *Patterson* v. *Dempsey,* supra, 442; see also *Opinion of the Justices,* 58 Del. 475, 210 A.2d 852; *In re Opinion of the Justices,* 294 Mass. 616, 2 N.E.2d 789.

The court recognized in the *Patterson* case that the primary evil intended to be curbed by the power of partial veto is the practice of log-rolling: Presented with a bill containing many items of appropriation, the governor may accept the essential and reject the frivolous. The governor in this context may thus control the amount of expenditure, but not the purpose. How much is spent is conceptually different from how an amount is spent. *Bengzon* v. *Secretary of Justice,* supra, 414–15; *Patterson* v. *Dempsey,* supra, 441–42.

## II

If the vetoed sections of House Bill No. 8022 constitute distinct items of appropriation, then, their veto by the governor was valid. If, however, the sections are general legislation, the partial veto power was exceeded and further consequences follow.

The term "item of appropriation" in the context of the partial veto power was also construed in *Patterson* v. *Dempsey,* supra, 438: " 'An item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropriation bill.' *Bengzon* v. *Secretary of Justice,* . . . [299 U.S. 410, 414, 57 S. Ct. 252, 81 L. Ed. 312]. 'An item in an appropriation

bill is an indivisible sum of money dedicated to a stated purpose.' *Commonwealth* v. *Dodson,* 176 Va. 281, 296, 11 S.E.2d 120." An item of appropriation is a "specific sum of money for a specified purpose. . . . These two factors are the essentials of an item." *Green* v. *Rawls,* 122 So. 2d 10, 16 (Fla.). The item must be "distinct." *Wood* v. *State Administrative Board,* 255 Mich. 220, 224, 238 N.W. 16. Language merely imposing restrictions or conditions on the expenditure of money is not subject to the veto power, since it is not in itself a "distinctly specified sum." *Black & White Taxicab Co.* v. *Standard Oil Co.,* 25 Ariz. 381, 218 P. 139; *Opinion of the Justices,* 294 Mass. 616, 2 N.E.2d 789.

It is not seriously contended that the vetoed sections would operate expressly to appropriate a stated sum of money. The defendants, however, press an argument that relies heavily on a line of cases beginning with *State* v. *Staub,* 61 Conn. 553, 23 A. 924, in which this court has recognized the duty of state officials to act pursuant to legislative mandates, regardless of specific appropriations. An unequivocal direction to act was deemed to imply an appropriation from the general fund sufficient to cover the cost of so acting. The specific holding in the *Staub* case was that mandamus might properly compel an official to perform purely ministerial duties that were mandated by statute. The court there said (p. 563): "In the absence of a special appropriation the existence of a law requiring the expenditure to be incurred is an appropriation of money for that purpose, and the law imposes upon the comptroller the duty of settling and adjusting demands against the state for such expenses." See also *Dowe* v. *Egan,* 133 Conn. 112, 48 A.2d 735; *Cummings* v. *Looney,* 89 Conn. 557, 95 A. 19; *New*

*Milford* v. *Litchfield County,* 70 Conn. 435, 39 A. 796; *Williams* v. *New Haven,* 68 Conn. 263, 36 A. 61; *Whitney* v. *New Haven,* 58 Conn. 450, 20 A. 666. The defendants' claim essentially is that § 2 of House Bill No. 8022 imposes a ministerial duty on the commissioner of transportation to proceed under § 13b-34 to ensure the continued operation of certain motor vehicle transportation facilities, and that an obligation to pay the costs necessary for the performance of that duty thus arises. Section 2, they claim, therefore contains an implied appropriation and as such is subject to the governor's power of partial veto. Even assuming, without deciding, that the rule enunciated in the *Staub* case is still valid, we must conclude that the rule is not applicable in this case.

An analysis of § 2 compels this conclusion. First, the section provides that the commissioner of transportation, notwithstanding the provisions of § 13b-35, as amended, *"shall* proceed in accordance with the provisions of section 13b-34 . . . to ensure that motor carrier transportation facilities shall be operated in the manner required by the general welfare of the state." (Emphasis added.) Section 13b-34, as amended, in turn, granted several discretionary powers to the commissioner. In order to promote or aid transportation facilities, he could contract with divers entities, but any payments would be subject to the prior approval of the state bond commission. With similar approval he could provide service and share in costs. He was given powers to implement the discretionary power granted to him. For example, he could receive various grants and acquire and dispose of interests in property. Of particular significance is § 13b-34 (e) : the commissioner "shall have the power to expend,

or to authorize the expenditure of, funds appropriated to him or to the department hereunder."

It is apparent that § 13b-34 is general legislation dependent for its operation on extrinsic funding. Section 16-338 of the General Statutes provides for such funding. This section creates a fund "[t]o finance the performance of the powers and duties of the commissioner under sections 13b-34 to 13b-36, inclusive." The state bond commission has the power to authorize the issue of both general and revenue bonds. With respect to the general bonds, "appropriation of all amounts necessary for punctual payment of such principal and interest is hereby made." The revenue bonds, generally, are on the other hand to be paid for by "moneys in the public service tax fund." The latter fund is authorized by § 16-338 (f). It is to be separate and distinct from all other funds and moneys; it is to be supported by public service taxes; and its proceeds are to be used first to pay obligations on the revenue bonds. Any excess may be used by the commissioner of transportation on the approval of the state bond commission, and any further excess is to be deposited in the general fund.

In the absence of further provisions, it could be argued rather tenuously that these statutory provisions permit § 2 of House Bill No. 8022 to be subject to partial veto as an "item of appropriation": (a) The section directs the commissioner to exercise his discretion in a way likely to incur additional expenditures; (b) the expenditures could be financed by general bonds; (c) the general bonds are obligations of the state for which general appropriations have been made, by virtue of § 16-338; and, therefore, (d) the legislative mandate to act implies an appropriation, under the *Staub* doctrine.

The final sentence of § 2 of House Bill No. 8022, however, destroys the validity of such a claim: "Expenditures by the commissioner in the exercise of his powers under said section 13b-34 and this act shall be charged to the resources of the public service tax fund available to the commissioner for such purposes." The inclusion of the word "available" clearly indicates that in making expenditures the commissioner is in fact confined to drawing on resources already at his disposal. There is no suggestion of any intention to make a new appropriation. Even if there were such an implication, the public service tax fund was an existing revolving fund not dependent on further appropriation and there is cogent authority holding that even where actual increases in expenditures from revolving funds were provided for by the legislature, such legislation is, nevertheless, not an item of appropriation subject to the veto power. See *Black & White Taxicab Co.* v. *Standard Oil Co.*, 25 Ariz. 381, 218 P. 139; *Commonwealth ex rel. Ball* v. *Powell*, 249 Pa. 144, 94 A. 746; *State* v. *Dammann*, 220 Wis. 143, 264 N.W. 622.

We conclude that § 2 of House Bill No. 8022 is not "any item or items" of a "bill making appropriations of money embracing distinct items."

The other sections of House Bill No. 8022 vetoed by the governor require but brief comment. Section 1 of the bill and the statement of purpose appended to the bill serve only to state legislative findings and to indicate the intent of the General Assembly. They do not constitute operative legislation and, properly, it has not been contended that they in any way constitute items making appropriations.

It is concluded that since none of the sections of the bill vetoed by the governor constitutes or con-

tains items of appropriation they were not subject to his veto in the exercise of the powers vested in him by article fourth, § 16, of the constitution of Connecticut. The partial veto is, therefore, invalid and the answer to the first reserved question is "No."

## III

The second question reserved for our advice is whether the governor has "the power to provide that in the event this line item veto is successfully challenged, then and in that event, his action be considered a veto of the entire House Bill 8022."

In his veto message, the governor provided that should his veto of the first two sections and the statement of purpose be successfully challenged, "then, and in that event, my action shall be considered a veto of the entire House Bill No. 8022." The effect of this portion of the veto message was to leave §§ 3, 4 and 5 of the bill suspended in a sort of legal purgatory: if the partial veto should not be "successfully challenged" sometime in the future, then the contingently approved sections would be law; but if any future challenge were successful and the partial veto held to be invalid, then the contingently approved sections would not be law.

As we have noted, the governor derives his veto power from article fourth, §§ 15 and 16, of the constitution. He constitutionally has three options on the presentation of any bill: "If the governor shall approve a bill, he shall sign and transmit it to the secretary of the state, but if he shall disapprove, he shall transmit it to the secretary with his objections. . . . In case the governor shall not transmit the bill to the secretary, either with his approval or with his objections, within five calendar days . . . [excluding Sundays and legal holidays] after the

same shall have been presented to him, it shall be a law at the expiration of that period." The governor, thus, has three choices: he may disapprove a bill, in which case it is returned to the legislature; he may approve a bill, in which case it becomes a law; or he may do nothing, whereupon the bill becomes a law at the expiration of the five-day period.

The governor's approval or disapproval, however, is effective only if his action is unconditional and not qualified. "This approval . . . must be . . . without qualification. Any attempt on his part to attach to his approval any qualification . . . will either be entirely nugatory and ineffectual, and leave the approval absolute, or it will completely nullify the approval and operate as a veto of the whole bill." *Lukens* v. *Nye,* 156 Cal. 498, 503, 105 P. 593; see 50 Am. Jur. 108, Statutes, § 107. By leaving his approval or disapproval of §§ 3, 4 and 5 dependent on the outcome of any future challenge to the validity of his attempted veto of the remaining sections and statement of purpose of the bill, the governor with finality neither approved nor disapproved the measures within the five-day period specified by the constitution. "It is of the first importance that the people should know to what law they are subject." *State* v. *South Norwalk,* 77 Conn. 257, 261, 58 A. 759.

In *State* v. *McCook,* 109 Conn. 621, 147 A. 126, the court held that an act of the legislature was void because it was not approved by the governor until nineteen days after the final adjournment of the General Assembly. At that time the constitution provided that if a bill was not returned by the governor to the legislature within three days, Sundays excepted, after it was presented to him it should become law as if he had signed it "unless

the General Assembly, by their adjournment, prevents its return, in which case it shall not be a law." Conn. Const., art. 4, § 12 (1818). While the case is not strictly in point, the observations of the court are pertinent. They noted that if the governor had the power under the constitution to determine the time when such an act should become effective as a law "grave public abuse might follow the possession and use of this extraordinary power." *State* v. *McCook,* supra, 649. The court also commented (p. 649): "If the Governor can determine by his own will when Public Acts shall become laws his will will override the long-exercised power of the General Assembly" (to designate the day when Public Acts shall become laws). Much more objectionable would be a strained construction of the present constitutional provisions to permit the governor to determine that an act passed by the General Assembly should be valid until some undetermined time in the future when on the possible happening of an event over which neither he nor the legislature had any control the act should cease to be law.

If the governor's conditional veto of the three sections of the bill which he tentatively approved were constitutionally permissible, the situation in effect would be no different from one in which the governor instead of acting within the constitutionally prescribed five days waited until the condition should eventuate and thereupon disapprove the legislation. The defendants, citing no authority, stress the difficulty of the situation of the governor and his effort, in good faith, to extricate himself and to explain his stand to the legislature and the people. The difficulty of his position can be readily appreciated, but the constitutionally prescribed time period may not be contravened. "Whatever . . . [the con-

stitution] prescribes, the General Assembly, and every officer or citizen to whom the mandate is addressed, must do; and whatever it prohibits, the General Assembly, and every officer and citizen, must refrain from doing; and if either attempt to do that which is prescribed, in any other manner than that prescribed, or to do in any manner that which is prohibited, their action is repugnant to that supreme and paramount law, and invalid." *Opinion of the Judges,* 30 Conn. 591, 593.

Because the veto was conditioned on the happening at some uncertain time in the future of a condition subsequent, which time could well be beyond the constitutionally prescribed period, it must be concluded that the governor had no constitutional power to disapprove the bill in that manner. The answer to the second reserved question, therefore, is "No."

## IV

The third and final reserved question concerns the present status of House Bill No. 8022: Does the secretary of the state now have the duty to record and certify the entire bill as a law?

As we have already noted, the governor constitutionally had no power to veto §§ 1 and 2 of the bill and its statement of purpose. In the similar *Patterson* case, we held that such a veto was "unconstitutional and void." *Patterson* v. *Dempsey,* 152 Conn. 431, 443, 207 A.2d 739. This decision is in accord with the overwhelming weight of authority holding that a veto exercised in excess of constitutional authority is an ineffective nullity. See *Black & White Taxicab Co.* v. *Standard Oil Co.,* 25 Ariz. 381, 218 P. 139; *Lukens* v. *Nye, supra,* 595; *State ex rel. Turner* v. *Iowa State Highway Commission,*

186 N.W.2d 141 (Iowa); *In re Opinion of the Justices,* 294 Mass. 616, 2 N.E.2d 789; *Wood* v. *State Administrative Board,* 255 Mich. 220, 238 N.W. 16. Under the provisions of the Connecticut constitution, effective gubernatorial disapproval is required if a legislative enactment is not to become a law. Conn. Const., 1965, art. 4, §§ 15, 16; *Patterson* v. *Dempsey, supra.* It follows that the governor's action in purporting to veto portions of House Bill No. 8022 is void.

An untimely veto is also void. *Morehouse* v. *Employers' Liability Assurance Corporation,* 119 Conn. 416, 421, 177 A. 568; *Siller* v. *Siller,* 112 Conn. 145, 148, 151 A. 524; *State* v. *McCook,* 109 Conn. 621, 649, 147 A. 126. "We used the word void in the sense that such Acts are of no legal effect, and not in the sense that they are voidable." *Preveslin* v. *Derby & Ansonia Developing Co.,* 112 Conn. 129, 133, 151 A. 518. It follows that the action of the governor in attempting to effect a veto of the remaining sections of House Bill No. 8022 contingent on the uncertain happening of a future event is likewise void.

We have already noted that the constitution grants three options to a governor: effective approval, effective disapproval and no action. A void action is a nullity; the effect is the same as nonaction. Since the governor effectively vetoed none of the sections of House Bill No. 8022, the bill became a law at the expiration of the constitutional period and the secretary of the state should proceed accordingly.

The defendants argue that since the legislature took no action after the governor's veto message was announced, the present action was prematurely brought. The contention might have had some merit

if the governor's action was merely voidable. But since the action of the governor was totally void, the legislature was under no obligation to take further action. There is no reason to reenact an existing law.

The answer to the third question, therefore, is "Yes."

In summary, the Superior Court is advised that the answers to the three questions reserved for the advice of this court are: Question 1, "No"; question 2, "No"; question 3, "Yes."

No costs will be taxed in this court in favor of any party.

In this opinion the other judges concurred.