P. R. Railway, Light & Power Co., peticionaria, *v.* Benjamín Ortiz, Juez, Corte de Distrito de Humacao, demandado.

Núm. 79.—*Sometido:* Diciembre 22, 1941. *Resuelto:* Febrero 18, 1942.

*Brown, González & Newsom* y *E. Córdova Díaz,* abogados de la peti-
cionaria; *Hon. Procurador General George A. Malcolm, Pablo
Defendini* y *R. García Cintrón, Procuradores Generales Auxiliares,*
abogados de El Pueblo, demandante en el pleito principal.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tri-
bunal.

El Pueblo de Puerto Rico, representado por su Goberna-
dor, Comisionado del Interior y Procurador General, Sres.
Rexford G. Tugwell, Sergio Cuevas Bustamante y George A.
Malcolm, respectivamente, instituyó en la corte inferior un
procedimiento de expropiación forzosa contra la peticionaria
en este caso, P. R. Railway, Light & Power Co. Expuso en
su demanda dos causas de acción. En la primera, alegó que
la demandada, con fecha 4 de enero de 1928, obtuvo la fran-
quicia número 591, titulada "An Ordinance granting to the
Porto Rico Railway, Light & Power Company authority to
utilize the waters and waterfalls of the Hicaco, Cubuy, Prieto
and Sabana Rivers, and their tributaries, which form the
so-called 'Blanco' River, in Naguabo, Puerto Rico, and the
so-called Río Blanco Development, and to construct, maintain
and operate a hydroelectric plant and the necessary trans-
mission lines to develop and transmit electric current;" que
de acuerdo con las disposiciones de la sección 9 de dicha
franquicia, la concesionaria se obligó a traspasar a El Pueblo
de Puerto Rico la planta antes mencionada, con todas sus
pertenencias, excluyendo las líneas de transmisión, por un
precio equivalente al costo original de dicha planta y per-
tenencias, más el costo de las mejoras efectuadas, menos

depreciación, todo ello a la terminación de un plazo de diez años contados desde la fecha en que la planta y líneas de transmisión autorizadas por la franquicia estuvieren construídas y funcionando, debiendo el Comisionado del Interior notificar a la concesionaria la intención de El Pueblo de Puerto Rico de verificar dicha compra con un año de anticipación a la expiración del plazo de diez años antes mencionado; que dentro del término especificado en la franquicia, allá por el 8 de agosto de 1938, el Comisionado del Interior notificó a la concesionaria el propósito de El Pueblo de Puerto Rico de adquirir, el 12 de septiembre de 1939, la mencionada planta conocida por "Planta Hidroeléctrica de Río Blanco," sus pertenencias y accesorios, excluyendo las líneas de transmisión, por el precio convenido en la franquicia, que en opinión del demandante representa el valor justo y razonable de dichas propiedades; que a ese efecto ofreció a la concesionaria el precio de la planta hidroeléctrica y sus pertenencias, excluyendo las líneas de transmisión, montante dicho precio a la cantidad de $871,066.35, y no habiendo sido aceptado por la demandada, peticionaria en este caso, estableció, por conducto del entonces Comisionado del Interior, Sr. José Enrique Colom, un procedimiento de expropiación forzosa, habiéndose desestimado la demanda de dicho procedimiento el 20 de septiembre de 1941; que el 4 de octubre siguiente el demandante requirió una vez más a la concesionaria para que le transmitiese el dominio de dichas propiedades e inició este procedimiento en la corte inferior, alegando además de los hechos antes expuestos, que era la creencia del Comisionado del Interior que la referida planta con sus pertenencias es necesaria para el desarrollo y funcionamiento adecuado del sistema hidroeléctrico que El Pueblo de Puerto Rico tiene establecido y explota a través del Negociado de las Fuentes Fluviales de Puerto Rico, y que a los fines de lograr su adquisición, el indicado funcionario había solicitado del Procurador General de Puerto Rico la institución de estos procedimientos. Como

segunda causa de acción el demandante reprodujo las alegaciones pertinentes de la primera y continuó exponiendo que para el adecuado desarrollo y funcionamiento del referido sistema eléctrico, era imprescindible la adquisición de las líneas de transmisión que la demandada ha construído y mantiene bajo los términos de la franquicia número 591 que se mencionan en la primera causa de acción, las cuales se extienden desde la planta hidroeléctrica de Río Blanco hasta un punto cerca de la Central Vannina, en el Municipio de Río Piedras, describiéndose dichas líneas de transmisión en el *exhibit* C que acompañó e hizo parte de la demanda, alegando también que el 4 de octubre de 1941 requirió a la demandada para que le vendiera dichas líneas, ofreciéndole en pago de las mismas la cantidad de $60,845 que según el demandante es el valor razonable de las mismas, a lo que se negó la demandada. Terminó la demanda con súplica de sentencia decretando la expropiación de la planta hidroeléctrica de Río Blanco con todas sus pertenencias, incluyendo las líneas de transmisión según se describen una y otras en los exhibits A y C, por una cantidad que no exceda de $871,066.35, como compensación por la planta y sus pertenencias y la de $60,845, como compensación por las líneas de transmisión, con los demás pronunciamientos que sean pertinentes.

El mismo día 8 de octubre de 1941 El Pueblo de Puerto Rico, representado por los funcionarios antes mencionados, radicó en la corte inferior un escrito que tituló "Declaración de Adquisición", en el que expresó que se proponía adquirir para los fines públicos antes mencionados, el título de dominio sobre las propiedades a que se contrae la demanda en sus dos causas de acción, acompañando planos de dichas propiedades, y consignó dos cheques certificados por "The National City Bank of New York, San Juan Branch", a la orden de la demandada, uno de ellos por $871,066.35 representativo de la compensación correspondiente a las propiedades a que se refiere la primera causa de acción, y el otro

por $60,845 correspondiente a la compensación de la propiedad que es objeto de la segunda causa de acción. En dicho escrito se expresó además que las referidas sumas se consignaban para que fuesen depositadas en la secretaría de la corte o en cualquier otra forma que la corte ordenara, a disposición y para beneficio de la demandada, y se hizo constar también lo siguiente:

"Es la opinión del demandante, así como la de los declarantes, individual y colectivamente, que las sumas que en última instancia hayan de proveerse o determinarse en este litigio como compensación por las referidas propiedades estarán dentro de cualquier límite que en ley puede y debe pagarse como valor justo y razonable por el concepto indicado."

También radicó el demandante una moción solicitando que se ordenase la entrega material de las propiedades antes mencionadas dentro de un plazo no mayor de quince días a partir de la fecha en que fuese notificada a la demandada la orden de entrega, y la corte, el mismo día 8 de octubre de 1941, dictó una resolución en la que luego de hacer una reseña de los procedimientos habidos ante ella terminó así:

"Por tanto, la corte por la presente declara, resuelve, ordena y decreta:

"(1) Que el título de dominio absoluto en las propiedades que aparecen descritas en los *exhibits* 'A', 'B' y 'C' que se acompañan a esta resolución y se hacen formar parte integrante de la misma, quedó investido en El Pueblo de Puerto Rico desde el momento en que éste radicó la referida Declaración de Adquisición y depositó en la Secretaría de esta corte las sumas de ochocientos setenta y un mil sesenta y seis dólares y treinta y cinco centavos ($871,066.35) y sesenta mil ochocientos cuarenta y cinco dólares ($60,845.00), según se ha expresado anteriormente en esta resolución;

"(2) Que las referidas propiedades quedan expropiadas y adquiridas para uso de El Pueblo de Puerto Rico, y que el derecho a una justa compensación por las propiedades adquiridas y expropiadas queda investido en la demandada en este caso, Porto Rico Railway, Light & Power Co., y el importe de dicha compensación queda sujeto a determinarse en este procedimiento mediante sentencia dictada de acuerdo con la ley;

"(3) Que El Pueblo de Puerto Rico tiene ahora derecho a la posesión de las propiedades antes descritas, las que la demandada debe entregar materialmente y a todos los fines y propósitos legales a El Pueblo de Puerto Rico, por conducto de sus representantes autorizados, el Gobernador de Puerto Rico, el Comisionado del Interior de Puerto Rico y el Procurador General de Puerto Rico, o a cualquiera de ellos, dentro de un período no mayor de quince días, a contar desde la fecha de la notificación de una copia de esta resolución a la demandada;

"(4) Que esta causa quedará abierta para cualquier orden, sentencia o decreto adicional que pudiere ser necesario en relación con la misma;

"(5) Y se ordena, además, que por el secretario de esta corte se dirija el correspondiente mandamiento al Márshal de la Corte de Distrito del Distrito Judicial de San Juan para que notifique y entregue inmediatamente una copia de esta resolución a la demandada, y que, una vez efectuado el correspondiente diligenciamiento, se haga constar en los autos de este caso.''

La demandada, que no había sido notificada del procedimiento de expropiación ni tampoco de la orden de entrega hasta el 10 de octubre, el 16 de dicho mes radicó una extensa moción en la corte inferior solicitando que se dejase sin efecto la antes mencionada resolución de 8 de octubre de 1941 por la que se le ordenaba la entrega material de las propiedades objeto de la expropiación y que, mientras se resolvía su indicada moción, se dejase en suspenso el plazo para la entrega. No vamos a exponer los fundamentos alegados en dicha moción de la demandada, ya que nos proponemos expresarlos y discutirlos más adelante al considerar y resolver la petición del auto inhibitorio radicada por la demandada, que es motivo de esta opinión, y en la cual se levantan idénticas cuestiones.

La moción de la demandada fué denegada por resolución de 20 de octubre de 1941. Opinó la corte inferior que las cuestiones suscitadas en dicha moción debían ser resueltas al decidirse el caso en sus méritos; que la sección 5–A adicionada a la Ley sobre Expropiación Forzosa por la ley núm. 2 de 1941 (Leyes de ese año, pág. 285) impone a la

corte el deber ministerial de decretar la entrega una vez que la parte demandante cumple con los requisitos legales y que si luego, al resolverse el caso en sus méritos, resultase que el demandante no tenía derecho a la entrega de los bienes, podría entonces reclamar los perjuicios que por tal motivo se le hubieran causado. Sin embargo, le asaltó la duda de que pudiera decretarse la entrega si la sección 5-A fuese inconstitucional, y declaró entonces que si la ley fuese claramente inconstitucional a pesar de los términos imperativos en que está concebida la sección 5-A, la demandante no tendría derecho a la entrega de los bienes, pero inmediatamente declaró que la ley no es claramente inconstitucional. Sin embargo, al terminar su indicada resolución, se expresó así:

"Por estos fundamentos, la corte ahora declara sin lugar la moción para que se anulase la orden de entrega y deja en pie su anterior orden de entrega *a menos que no haya alguna petición adicional.*" (Bastardillas nuestras.)

Sin esperar la "petición adicional", la corte, de su propia iniciativa, enmendó su resolución el 21 de octubre de 1941, expresándose entonces en los siguientes términos:

"La corte ratifica su criterio de que casi todas las objeciones levantadas por la demandada a la orden de entrega pueden resolverse posteriormente dentro del pleito principal, sin que su determinación sea un obstáculo o una condición previa a la orden de entrega. Tales objeciones se refieren a la suficiencia de la demanda y pueden interponerse mediante una excepción previa a la demanda. Sin embargo, se ha levantado una objeción que, posiblemente, no se podría someter posteriormente, ya que no surge de las alegaciones de la demanda. Esta objeción se refiere a la constitucionalidad de la sección 5-A de la ley núm. 2 de 1941, o sea, a la constitucionalidad del procedimiento de entrega inmediata. Tal cuestión no podría ser comprendida en una excepción previa o contestación a la demanda en sí, y, por lo tanto, esta corte entiende ahora que la parte demandada tiene derecho a solicitar la nulidad de la entrega como cuestión preliminar, por un fundamento de inconstitucionalidad. Sin embargo, llegamos ahora a la conclusión definitiva de que la referida sección 5-A es consti-

tucional y válida, ya que la parte demandada tiene derecho a una audiencia y a una oportunidad de ser oída en una etapa posterior del procedimiento y la entrega puede verificarse constitucionalmente antes de esa audiencia (véase la jurisprudencia sentada en el caso de *U. S.* v. *72 Acres of Land,* 37 F. Supp. 297). En cuanto a la cuestión constitucional que se ha levantado relacionada con el título de la ley núm. 2 de 1941, esta corte llega ahora a la conclusión definitiva de que dicho título es suficiente, y también llega a la conclusión de que de la referida ley núm. 2 y de las alegaciones en este caso surge adecuadamente la obligación de El Pueblo de Puerto Rico de pagarle a la demandada por la compensación que esta corte finalmente determinare.

"Por lo tanto, esta corte ratifica su criterio en el sentido de que la moción para que se deje sin efecto la orden de entrega debe ser declarada sin' lugar. Notifíquese."

Tal era el estado de los procedimientos en la corte inferior cuando la peticionaria recurrió a este tribunal en solicitud del auto inhibitorio que nos ocupa. En dicha petición hace la historia de los procedimientos habidos en la corte inferior, reseñados anteriormente, y expone los fundamentos que alegó para que se anulase la orden de entrega de bienes, fundamentos que podemos resumir así: (*a*) falta de capacidad legal en el Gobernador, el Comisionado del Interior y el Procurador General de Puerto Rico, para instituir a nombre de El Pueblo de Puerto Rico el procedimiento de expropiación forzosa; (*b*) ser falsa la alegación del demandante al efecto de que las líneas de transmisión objeto de la segunda causa de acción alegada en la demanda fueron construídas y mantenidas bajo las disposiciones de la franquicia número 591, a virtud de la cual la planta hidroeléctrica de Río Blanco fué construída y operada; y (*c*) inconstitucionalidad de la sección 5–A adicionada a la Ley sobre expropiación forzosa por la ley número 2 de 1941. Alegó además la peticionaria que a menos que este tribunal revise la decisión de la Corte de Distrito de Humacao por medio de un auto inhibitorio o un auto de *certiorari,* aún cuando la peti-

cionaria tuviese derecho a apelar, sería privada de su propiedad sin el debido proceso de ley y se vería obligada a continuar litigando la causa principal en la Corte de Distrito de Humacao con los consiguientes grandes desembolsos de dinero y pérdida de tiempo, antes de que su apelación pudiera ser resuelta por este tribunal. La peticionaria solicitó la expedición de un auto inhibitorio o en la alternativa de un auto de certiorari, y este tribunal, luego de oír ampliamente a las partes por escrito y oralmente sobre la procedencia de uno y otro recurso, decidió expedir el auto inhibitorio, habiendo decretado antes la suspensión de la orden de entrega en tanto se resolvía en definitiva este recurso, todo ello previa prestación de fianza, que, por las circunstancias especiales del caso, fijó en $3,000, para responder a El Pueblo de Puerto Rico de los daños y perjuicios que pudieran irrogárseles con dicha suspensión si no hubiera derecho a ella, sin perjuicio de que en su oportunidad pueda el Pueblo de Puerto Rico solicitar que se aumente dicha fianza si así fuese procedente.

Expuestos estos antecedentes, procede ahora entrar a considerar y resolver el auto inhibitorio.

La primera cuestión a resolver se refiere a la capacidad del Gobernador, del Comisionado del Interior y del Procurador General de Puerto Rico para instar este procedimiento a nombre de El Pueblo de Puerto Rico.

Antes de entrar a considerar las leyes locales relativas al ejercicio del poder de expropiación forzosa, parece conveniente dejar establecidos ciertos principios generales sobre la materia, que no deben perderse de vista al interpretar dichas leyes. Uno de estos principios generales es el que sostiene que el poder de expropiar la propiedad privada para usos públicos reside en el Estado como un atributo de su soberanía, y que esa facultad sólo puede ejercitarse a través de una ley que lo autorice y designe el funcionario o funcionarios que en su nombre puedan instar el procedimiento.

A este efecto se dijo en *Matter of Poughkeepsie Bridge Co.*, 108 N.Y. 483, 490, citado por la peticionaria:

"El dominio eminente que reside en el Estado como un atributo de su soberanía permanece latente, sin embargo, hasta que se ejercita por medio de una ley de la legislatura. Mientras una ley no lo autorice, permanecerá latente y meramente potencial, y no activo y eficiente, y el estado no puede ejercitar la prerrogativa ni delegar su poder de ejercitarla, excepto por medio de legislación. Por consiguiente, cuando se intenta ejercitar esa facultad para tomar la propiedad privada bajo el poder del dominio eminente, por los funcionarios del Estado o por una corporación organizada para fines de utilidad pública, los funcionarios o entidad que reclamen el derecho deberán poder indicar el estatuto que les confiera la autoridad para ello."

A ese mismo efecto se dice en 29 C.J.S., "Eminent Domain", sección 22:

"*Autoridad Legal.*—El derecho a ejercitar el poder de dominio eminente deberá ser conferido por el estatuto, bien en términos expresos o por necesaria implicación; y las leyes que lo confieran deberán ser estrictamente interpretadas."

Aparte de lo que diremos más adelante con respecto a la facultad del Gobernador como miembro de la Autoridad de Fuentes Fluviales, no conocemos ninguna otra ley que autorice a dicho funcionario para instar procedimiento de expropiación forzosa. Y en cuanto al Procurador General, tampoco existe ley alguna que lo autorice para instar tal procedimiento, a no ser en su carácter de abogado de los funcionarios que puedan estar legalmente autorizados para instar el procedimiento. Por consiguiente, sólo nos resta determinar si esa facultad ha sido conferida al Comisionado del Interior.

La representación legal de El Pueblo de Puerto Rico invoca la Resolución Conjunta número 36, aprobada el 29 de abril de 1927 (Leyes de ese año, pág. 345), como la fuente de donde emana la facultad del Comisionado del Interior para instituir el procedimiento de expropiación forzosa a nombre de El Pueblo de Puerto Rico. Admite dicha repre-

sentación legal que la citada Resolución Conjunta fué anulada a virtud de nuestra decisión en el caso de *Valiente & Co. v. Sancho Bonet, Tes.*, 50 D.P.R. 586, confirmado en 93 F. (2d) 327, habiéndose denegado el certiorari que se interpuso en la Corte Suprema de los Estados Unidos en 303 U.S. 662, y denegado también la reconsideración a la negativa a expedir el auto de certiorari en 304 U.S. 588. La representación legal de El Pueblo de Puerto Rico alega que no obstante haber sido anulada la Resolución Conjunta núm. 36, posteriormente fué convalidada por la ley núm. 93 de 6 de mayo de 1938 (Leyes de ese año, pág. 211), y por la ley del Congreso de los Estados Unidos aprobada en 16 de junio de 1938 (52 Stat. pág. 708).

Vamos a asumir, a los efectos de la discusión, que la citada Resolución Conjunta fué convalidada por la ley núm. 93 de 6 de mayo de 1938, y si se quiere, vamos a asumir que también fué convalidada por la del Congreso de los Estados Unidos aprobada el 16 de junio de 1938. Aun así, nos enconraríamos con que dicha resolución fué sustituída y por consiguiente derogada por la Ley de la Autoridad de las Fuentes Fluviales de Puerto Rico, aprobada el 2 de mayo de 1941 (pág. 685), que empezó a regir el 31 de julio de dicho año, y por lo tanto estaba ya en vigor cuando se instó el procedimiento de expropiación forzosa en la corte inferior el 8 de octubre de 1941. Un ligero estudio comparativo de ambas leyes, es decir, de la Resolución Conjunta denominada "Ley para el Desarrollo de las Fuentes Fluviales" y de la Ley de Autoridad de las Fuentes Fluviales de Puerto Rico, nos convencerá de que la última derogó a la primera. Una y otra persiguen el mismo propósito, claramente expresados en sus títulos respectivos, a saber:

"Resolución Conjunta Núm. 36.

"Declarando de necesidad y conveniencia pública como medida de protección y conservación de los recursos naturales de Puerto Rico, el desarrollo y explotación por el Pueblo de Puerto Rico de las Fuentes Fluviales aprovechables; imponiendo sobre el valor

tasado de toda la propiedad mueble e inmueble de Puerto Rico, no exenta de tasación, una contribución anual y especial de un décimo de uno por ciento (1/10 de 1 por ciento) a partir del primero de julio de 1925 y durante los años fiscales 1925–1926, 1926–1927, 1927–1928, 1928–1929 y 1929–1930, adicional a todas las demás contribuciones impuestas por virtud de otras leyes vigentes, para crear un fondo que se dedicará a la construcción y en parte a la explotación de obras para desarrollar dichas fuentes fluviales; derogando la Ley núm. 60, aprobada en 28 de julio de 1925, y transfiriendo el balance acumulado de la contribución impuesta en el fondo especial creado por dicha ley Núm. 60 aprobada en julio 28 de 1925, al fondo especial creado por esta ley, y para otros fines.''

"Ley Núm. 83.

''Creando la autoridad para las fuentes fluviales de Puerto Rico; proveyendo para sus facultades y deberes; traspasando a dicha autoridad todas las propiedades, derechos, deberes y obligaciones de utilización de las fuentes fluviales; autorizándola para adquirir, construir, conservar, operar, mejorar y extender empresas productoras de rentas para continuar el desarrollo de las fuentes fluviales de la Isla; proveyendo para la fijación y cobro de tarifas, derechos y otros impuestos por los servicios de tales empresas, y para separar o combinar, empeñar, gravar y de otro modo comprometer las rentas de las mismas, autorizándola a aceptar donaciones y préstamos de los Estados Unidos o de cualquiera agencia o dependencia de los mismos, a tomar dinero a préstamo y emitir bonos negociables, proveyendo para el pago de dichos bonos y para la fijación de los derechos de los tenedores de los mismos; autorizando a El Pueblo de Puerto Rico a adquirir bienes raíces para la Autoridad; autorizando a los municipios y subdivisiones a ceder y traspasar propiedad inmueble a la Autoridad; declarando de utilidad pública cualesquiera obras, proyectos e inmuebles necesarios para llevar a cabo los propósitos de esta ley; prohibiendo la expedición de interdictos que impidan la ejecución de esta ley, y para otros fines.''

Si del título pasamos al texto de ambas leyes, fácilmente comprenderemos que el propósito de la segunda es sustituir a la vez que revisar y ampliar la primera, sin que exista indicio alguno de que fuera la intención de la Asamblea Legislativa dejar en vigor la Ley para el Desorrollo de las Fuentes Fluviales. Por el contrario, se dispone en la de la Autoridad de Fuentes Fluviales que todas las propiedades,

derechos, deberes y obligaciones de "Utilización de las Fuentes Fluviales" sean traspasados a la Autoridad de Fuentes Fluviales. Parece conveniente aclarar aquí que la frase "utilización de las fuentes fluviales" significa, de acuerdo con la sección 12 de la Ley para el Desarrollo de las Fuentes Fluviales, el conjunto de actividades que bajo dicha ley se crea.

Siendo ello así, habiendo sido la ley anterior (la Resolución Conjunta núm. 36) sustituída por la posterior (la ley núm. 83 de 1941), claro es que la primera dejó de existir y con ella también dejó de existir cualquier facultad concedida al Comisionado del Interior a virtud de la misma. Véase el caso de *Méndez* v. *Comisión de Servicio Civil*, 45 D.P.R. 112, donde se discute una cuestión similar en relación con la Ley de Servicio Civil de 1931 (pág. 535).

Así, pues, debemos recurrir a la Ley de Autoridad de Fuentes Fluviales para determinar entonces si por virtud de sus disposiciones se concede al Gobernador y al Comisionado del Interior (ya que la representación del Procurador General es meramente la de abogado) la autoridad suficiente para establecer procedimientos de expropiación forzosa.

La Ley de la Autoridad de Fuentes Fluviales en su sección 4 (*a*) prescribe que los poderes de la Autoridad se ejercerán por un cuerpo de gobierno compuesto de los miembros de la Autoridad actuando como Junta, y que esta última estará compuesta por el Gobernador como Presidente y el Comisionado del Interior como Vicepresidente; y en su sección 6, al definir los poderes de la Autoridad, o sea de la junta, en su apartado (*h*) le concede la facultad de "adquirir por compra, arrendamiento, legado, donación, o *por el ejercicio del poder de expropiación forzosa* en la forma que proveen las leyes de Puerto Rico, y retener, conservar y explotar cualquier empresa o partes de ésta." Dicho inciso (*h*) se halla relacionado con la sección 23 de la propia ley, que bajo el título de "Declaración de Utilidad Pública", dice:

"Sección 23.—Para los propósitos del inciso (h) de la sección 6, y de esta ley en general, toda obra, proyecto, inmueble, con sus accesorios, que la Autoridad estime necesario y conveniente para llevar a cabo los propósitos expresados en esta Ley, queda por la presente declarado de utilidad pública."

Bajo la sección 6, el Gobernador y el Comisionado del Interior, actuando como miembros de la junta, tienen la facultad de establecer en ese carácter procedimientos de expropiación forzosa a nombre y en representación de dicha Autoridad; pero en la expropiación instada en la corte inferior dichos funcionarios no comparecen como tales miembros de la Autoridad ni a nombre de ésta, y por consiguiente no pueden derivar facultad alguna de la sección 6, supra. Aquí el procedimiento se instó a nombre de El Pueblo de Puerto Rico, actuando ellos como funcionarios de El Pueblo de Puerto Rico. Por lo tanto, tenemos que buscar su autoridad en la sección 13 de la misma ley, que bajo el título de "Adquisición de Terrenos por El Pueblo de Puerto Rico para la Autoridad," prescribe:

"Sección 13.—A solicitud de la Autoridad, el Gobierno Insular tendrá facultad para adquirir, a nombre de la Autoridad, por compra o por expropiación forzosa, en la forma que proveen las leyes insulares sobre expropiación forzosa, título de cualquier propiedad inmueble o interés sobre la misma que fuere necesario o conveniente para los fines de la Autoridad, y ésta pagará por toda la referida propiedad inmueble. La facultad que por la presente se confiere no limitará ni restringirá la facultad de la propia Autoridad para adquirir propiedades inmuebles por compra o expropiación forzosa."

La transcrita sección no indica qué funcionario puede establecer el procedimento a nombre y en representación del Gobierno Insular, requisito éste indispensable, como hemos visto, para que un funcionario o entidad pueda ejercitar la facultad de expropiar a nombre del estado. Véase, además de las autoridades antes citadas, el caso de *U. S.* v. *458.95 Acres of Land,* 22 F. Supp. 1017, 1019. Siendo ello así, la sección 13 no les confiere tal facultad, y como tampoco se la

confiere ningún otro precepto legal, tenemos que llegar a la conclusión de que ni el Gobernador ni el Comisionado del Interior tienen la capacidad legal necesaria para instar, a nombre de El Pueblo de Puerto Rico, el referido procedimiento.

■■ Resuelta la primera cuestión suscitada en la petición de auto inhibitorio a favor de la peticionaria, podríamos terminar aquí esta opinión y declarar con lugar el auto solicitado, pero la mayoría de las otras cuestiones suscitadas en este caso son de tal interés público que creemos nuestro deber considerarlas, para disipar dudas y evitar litigios.

La segunda cuestión a determinar, o sea si la corte inferior debió recibir evidencia pertinente a la cuestión de si las líneas de transmisión objeto de la segunda causa de acción alegada en la demanda fueron o no construídas y mantenidas bajo las disposiciones de la franquicia número 591, no merece seria consideración. A los efectos de la petición de auto inhibitorio, entendemos que, debemos asumir que los hechos alegados en la demanda de expropiación forzosa son ciertos, pues de lo contrario desnaturalizaríamos el procedimiento, ya que con igual derecho podría la peticionaria exigir que como cuestión previa a la orden de entrega se resolviese por la corte inferior cualquiera o todas las demás alegaciones de la demanda que fueren controvertidas por la demandada. Como muy bien resolvió la corte inferior, esa cuestión debe ser considerada y resuelta en la sentencia final que se dicte.

Procederemos a considerar ahora la tercera de las cuestiones suscitadas por la peticionaria, es decir, la que se refiere a la constitucionalidad de la sección 5–A de la Ley Estableciendo la Expropiación Forzosa, etc., que literalmente dice así:

"En cualquier procedimiento entablado o que se entable por y a nombre y bajo la autoridad de El Pueblo de Puerto Rico para la adquisición de cualquier propiedad para uso público, el peticionario o demandante podrá radicar dentro de la misma causa, al tiempo

de radicar la demanda o en cualquier momento antes de recaer sentencia, una declaración para la adquisición y entrega material de la propiedad objeto de expropiación, firmada dicha declaración por la persona o entidad autorizada por Ley para la expropiación correspondiente, declarando que se pretende adquirir dicha propiedad para uso de El Pueblo de Puerto Rico. Dicha declaración sobre adquisición y entrega material deberá contener y estar acompañada de (1) una relación de la autoridad bajo la cual se pretende adquirir la propiedad y el uso público para el cual se pretende adquirirla; (2) una descripción de la propiedad que sea suficiente para identificarla; (3) una relación del título o interés que se pretende adquirir de la propiedad para fines públicos; (4) un plano en caso de propiedad que pueda ser así representada; (5) una fijación de la suma de dinero estimada por la autoridad adquiriente como justa compensación de la propiedad que se pretende adquirir.

"Tan pronto se radique tal declaración de adquisición y entrega y se haga el depósito en la corte, para beneficio y uso de la persona o personas naturales o jurídicas que tengan derecho al mismo, de la cantidad estimada como compensación y especificada en la declaración, el título absoluto de dominio de dicha propiedad, o cualquier derecho o interés menor en la misma según quede especificado en la declaración, quedará investido en El Pueblo de Puerto Rico, y tal propiedad deberá considerarse como expropiada y adquirida para el uso de El Pueblo de Puerto Rico, y el derecho a justa compensación por la misma quedará investido en la persona o personas a quienes corresponda; y dicha compensación deberá determinarse y adjudicarse en dicho procedimiento y decretarse por la sentencia que recaiga en el mismo, debiendo la sentencia incluir, como parte de la justa compensación concedida, intereses al tipo anual de seis (6) por ciento sobre la cantidad finalmente concedida como valor de la propiedad a contar desde la fecha de la adquisición, y desde dicha fecha hasta la fecha del pago; pero los intereses no deberán concederse sobre aquella parte de dicha cantidad que haya sido depositada y pagada en la corte. Ninguna cantidad así depositada y pagada estará sujeta a cargo alguno por concepto de comisión, depósito, o custodia.

"A solicitud de las partes interesadas, la corte podrá ordenar que el dinero depositado en la corte, o cualquier parte del mismo, sea pagado inmediatamente como la justa compensación, o parte de ésta, que se concediere en dicho procedimiento. Si la compensación que finalmente se concediere en relación con dicha propiedad, o parte

de ésta, excediere de la cantidad de dinero así recibida por cualquier persona que tenga derecho a la misma, la corte dictará sentencia contra El Pueblo de Puerto Rico por la cantidad de la deficiencia.

"Una vez radicada la petición de adquisición, la corte tendrá facultad para fijar el término dentro del cual y las condiciones bajo las cuales las personas naturales o jurídicas que están en posesión de las propiedades objeto del procedimiento deberán entregar la posesión material al peticionario. La corte tendrá facultad para dictar las órdenes que fueren justas y equitativas en relación con los gravámenes y otras cargas, que pesen sobre las propiedades, si algunos hubieren.

"*Disponiéndose*, que ningún recurso de apelación en una causa de esta naturaleza, ni ninguna fianza o garantía que pudiere prestarse en la misma, podrá tener el efecto de evitar o demorar la adquisición o investidura del título de las propiedades por y en El Pueblo de Puerto Rico, y su entrega material al mismo." (Leyes de 1941, pág. 285.)

Conviene consignar aquí que la sección 5–A antes transcrita, fué enmendada por la ley núm. 22 aprobada el 21 de noviembre de 1941 (Legislatura Extraordinaria, 69), pero que dicha enmienda no afecta en nada la resolución de este caso, puesto que solamente se contrae a hacer extensivo a la Autoridad de Hogares de Puerto Rico, o a cualquier Autoridad de Hogares municipal, el procedimiento prescrito por dicha sección 5–A.

La constitucionalidad del transcrito precepto legal es atacada desde dos ángulos distintos, a saber: (*a*) porque autoriza la entrega de la propiedad que se intente expropiar por el Pueblo de Puerto Rico, sin exigir que antes se pague la totalidad de la compensación razonable que determine la corte; y (*b*) porque en el supuesto de que tal facultad pueda tener la legislatura, la ley adolece del defecto de no exigir que se provea previamente un fondo que suficientemente garantice al propietario que habrá dinero con qué pagar la compensación si la corte en definitiva resuelve que ésta deba exceder de la cantidad depositada por El Pueblo de Puerto Rico a tenor de las disposiciones de la sección 5–A.

El precepto de la Ley Orgánica invocado por la peticionaria es aquella parte del artículo 2 que dice así:

"Private property shall not be taken or damaged for public use *except upon payment of just compensation* ascertained in the manner provided by law." (Bastardillas nuestras.)

En la edición española de la Ley Orgánica, el mismo precepto se traduce en la siguiente forma:

"La propiedad particular no será tomada ni perjudicada para uso público, *a no ser mediante el pago de una justa compensación* fijada en la forma provista por ley." (Bastardillas nuestras.)

La indicada cláusula de nuestra Ley Orgánica tiene su precedente en aquella parte de la Enmienda Quinta de la Constitución Federal que dice:

"Nor shall private property be taken for public use without just compensation."

La Sección 5-A de nuestra Ley de Expropiación Forzosa es casi una copia literal de una ley del Congreso (40 USCA, sección 258-*a*) que ha sido impugnada por los mismos fundamentos que lo es ahora la nuestra, y su constitucionalidad ha sido sostenida, entre otros, en los casos de *U. S.* v. *80 Acres of Land,* 26 F. Supp. 315, y *Hessel* v. *A. Smith & Co.,* 15 F. Supp. 953, citados por la representación legal de El Pueblo de Puerto Rico.

Sosteniendo la constitucionalidad de la sección 258-*a* de la ley del Congreso, se ha dicho que la Enmienda Quinta no provee o requiere que la compensación sea pagada con anterioridad a la ocupación de las tierras que han de expropiarse, pero el dueño tiene derecho a una razonable, cierta y adecuada provisión de fondos antes de que se le prive de la misma. *Cherokee Nation* v. *Southern Kansas R. Co.,* 135 U.S. 641, 659; *Bragg* v. *Weaver,* 251 U.S. 57, 62, y *Hurley* v. *Kincaid,* 285 U.S. 95.

En el caso de *Williams* v. *Parker,* 188 U.S. 491, 502, 503, se dijo por la Corte Suprema de Estados Unidos:

"En lo que a la constitucionalidad concierne, se ha resuelto reiteradamente que un estado puede autorizar que se tome posesión con anterioridad a cualquier pago o antes de que se determine en definitiva el importe total de la compensación. (Citas.)

"    .    .    .    .    .    .    .    .

"No cabe duda que si se hace una adecuada provisión de fondos para pagar la compensación, puede concederse autoridad para que se tome posesión de la propiedad mientras se determine en definitiva la cantidad que deba ser pagada por ella."

Sostiene, sin embargo, la peticionaria que la jurisprudencia federal no es de aplicación a este caso, porque el precepto de la Ley Orgánica no es igual al de la Enmienda Quinta de la Constitución Federal, y que la frase *"except upon payment of just compensation"* significa que el pago de la totalidad de la compensación debe hacerse previamente a, o por lo menos simultáneamente con, la transmisión del título y entrega de la propiedad.

Antes de determinar si existe o no diferencia sustancial entre el párrafo en cuestión del artículo 2 de la Ley Orgánica y el correspondiente de la Enmienda Quinta, parece oportuno consignar aquí la regla general prevaleciente en los Estados Unidos respecto a la toma de posesión antes de pagarse la compensación.

Tomamos de 29 C.J.S. *"Eminent Domain,"* sección 187:

"Sec. 187. *Toma de Posesión por los Estados Unidos, un Estado o Corporación Municipal.*—Generalmente no se requiere el pago previo cuando el que adquiere la posesión es los Estados Unidos, un estado, o una subdivisión municipal del estado, a menos que exista un precepto constitucional o estatutario que así lo exija. Esta regla aparentemente no se aplica en toda su extensión en algunas jurisdicciones, donde por disposiciones constitucionales o estatutarias se requiere el pago previo o depósito, o que se asegure el pago.

"Aunque hay alguna autoridad aparentemente en contrario, la regla es que en defecto de algún precepto constitucional que lo exija, generalmente no es necesario que un estado o subdivisión municipal del mismo pague la compensación antes de la entrega de la propiedad tomada para uso público, si se hace la debida provisión para el pago y para los medios o métodos por los cuales el propietario puede

establecer su reclamación y recibir el importe de la compensación o de los daños correspondientes; y de acuerdo con la opinión general, una disposición constitucional al efecto de que la propiedad particular no será tomada para uso público sin justa o razonable compensación, no requiere que ésta sea pagada con anterioridad a su ocupación."

Hemos hecho un estudio de las distintas constituciones estatales, habiendo podido observar que existe una división entre los estados en la redacción de la cláusula constitucional que prohibe que se tome o perjudique la propiedad particular para uso público sin justa o razonable compensación. La inmensa mayoría sigue a la Constitución Federal, que, como hemos visto, no requiere en forma alguna el pago previo de la compensación. Los estados que requieren el previo pago son Louisiana, Minnesota, Mississippi, Montana, Ohio, Oregon, Georgia, Indiana y California, cuya constitución de 1849 seguía a la Constitución Federal, pero que en la de 1879 se alineó con los estados que requieren el previo pago.

Si se examinan las indicadas constituciones se verá que en todas, ellas sin excepción alguna, se usan las palabras "first paid" o "first made" al referirse a la compensación. De suerte que se ha tenido el buen cuidado de usar un lenguaje inequívoco y preciso que no deja lugar a dudas sobre el significado del precepto constitucional, lo que demuestra que la frase "upon just compensation" no fué más que otra forma de expresar la misma idea contenida en la cláusula correspondiente de la Constitución Federal, pues de otro modo, como se hizo en las constituciones de los estados antes indicados, se hubiera usado un lenguaje tan explícito y preciso como el allí usado.

En la Ley Orgánica de Filipinas de 1916, el Congreso de los Estados Unidos usó exactamente el lenguaje de la Enmienda Quinta de la Constitución Federal, y no se concibe que en el año 1917, al aprobar nuestra Ley Orgánica, el mismo Congreso tuviese el propósito de establecer una diferencia entre la facultad concedida a la Legislatura de Filipi-

nas y la concedida a la nuestra, sobre todo si se tiene en cuenta que no existía razón alguna para ello, y especialmente cuando, como se ha dicho por la Corte Suprema de los Estados Unidos en el caso de *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 261:

"La concesión de poder legislativo con respecto a asuntos locales contenida en la sección 32 de la Ley Foraker y continuada en vigor por la sección 37 de la Ley Orgánica de 1917 es tan amplia y abarcadora como pudo expresarlo el lenguaje.

" . . . . . .

"El propósito de la Ley Foraker y de la Ley Orgánica es dar a Puerto Rico completos poderes para resolver sus asuntos locales con una autonomía similar a la de los estados y territorios incorporados."

¿Acaso el poder de expropiar la propiedad privada para uso público no es un asunto de carácter puramente local que afecta considerablemente el deber del Estado de velar por la protección y bienestar de sus ciudadanos? No armoniza con ese poder tan amplio concedido a nuestra Asamblea Legislativa para legislar sobre asuntos locales, esa limitación que según la peticionaria, impuso el Congreso de los Estados Unidos en relación con los poderes legislativos concernientes a la expropiación de la propiedad particular para uso público.

Repetimos que si la intención del Congreso hubiera sido conceder a la Asamblea Legislativa de Puerto Rico una facultad más restringida que la que concedió a Filipinas, siguiendo el ejemplo de las constituciones estatales que requieren el pago previo, habría usado, como en aquéllas, un lenguaje claro, terminante e inequívoco, y no uno que puede estar sujeto a distintas interpretaciones.

Siguiendo la regla enunciada en 29 C.J.S. *"Eminent Domain"*, sección 187, supra, en defecto de un claro precepto en nuestra Ley Orgánica u otra ley del Congreso que así limite el poder de nuestra Asamblea Legislativa, debemos resolver que Puerto Rico tiene, como la mayoría de los esta-

dos, la facultad de expropiar sin necesidad del previo pago de la compensación para poder adquirir la propiedad expropiada, cumpliendo, desde luego, con el requisito de proveer o asegurar la existencia de fondos para pagar la compensación cuando sea finalmente determinada. Esta conclusión está en armonía con la tendencia moderna del derecho de supeditar la propiedad privada al bienestar público siempre que pueda hacerse sin perjuicio sustancial para la primera, doctrina que está inspirada en la antigua máxima que dice *salus populi suprema lex est.*

Consideraremos ahora la última de las cuestiones planteadas, es decir, la que imputa a la Ley de Expropiación forzosa el defecto de no exigir que previamente se provea un fondo que suficientemente garantice al propietario que habrá dinero con qué pagar la compensación si la corte en definitiva resuelve que aquélla debe exceder de la cantidad depositada por El Pueblo de Puerto Rico a tenor de las disposiciones de la Sección 5–A.

En 29 C.J.S. *"Eminent Domain"*, sección 187, pág. 1079, se establece la regla en los siguientes términos:

*"Suficiencia de seguridad o provisión de fondos para el pago.—* Cuando no se requiere el pago previo, es suficiente con que se haya provisto un fondo adecuado y seguro, del cual se hará el pago, como por ejemplo, disponiendo que el pago debe hacerse de los fondos del tesoro público, ya sea del estado o de alguna subdivisión municipal del mismo, lo cual se considera equivalente a la compensación..."

En el caso de *State* v. *McCook*, (1929, Conn.), 64 A.L.R. 1453, la legislatura de Connecticut pasó una ley aprobando la cantidad de $35,000, o cualquier parte de la misma que fuere necesaria con el objeto de adquirir por expropiación forzosa o de otro modo cierta parcela de terreno para edificar un sanatorio para tuberculosos. La ley fué atacada por inconstitucional, alegándose que no se hacía una adecuada provisión de fondos para el caso de que la corte resolviese que el valor de los bienes entregados era mayor que

la cantidad asignada por la legislatura, y resolviendo la cuestión, después de enunciar el principio fundamental de que el estatuto que autorice la adquisición debe proveer los medios de asignar justa compensación, bien sea en el mismo estatuto o en otro cualquiera, se dijo por el tribunal:

"En la ley al amparo de la cual se instó este procedimiento, se aprobó la suma de $35,000, o aquella parte de la misma que fuere necesaria. Si la justa compensación por la tierra tomada excede de la cantidad asignada, ningún medio de pagar el exceso se provee en la ley especial ni en la general. Esto no cumple con el requisito indispensable de que el estatuto se ajuste al requisito constitucional. El apelar a las conocidas fuentes del estado no equivale a proporcionar la justa compensación que la ley debe proveer. Las disposiciones constitucionales deben cumplirse; no pueden ser ignoradas.

"En *Connecticut River R. R. Co.* v. *Franklin County,* 127 Mass. 50, a la página 55, 34 Am. Rep. 338, dijo la corte: 'Es suficiente con que el estatuto que autoriza la ocupación de la propiedad disponga la imposición y determinación de daños en la forma ordinaria, a ser pagados con cargo al tesoro del estado, y que autorice al gobernador para que expida libramientos para su pago...' Pero en el estatuto ante nos no se empeña la fe y crédito del estado, no se hace apropiación alguna de los fondos generales en el tesoro, ni se autoriza al Gobernador a expedir libramiento para que de ese fondo se paguen los daños. Por el contrario, los términos del estatuto impiden que se infiera tal obligación por parte del estado o que se infiera tal asignación o autorización por el hecho de que disponga que la tierra tomada para la estación de pasajeros sea pagada de los ingresos de la Troy & Greenfield Railroad and Hoosac Tunnel, y por el hecho de apropiar, para llevar a cabo los propósitos de la ley, una suma que no exceda de $9,000 para ser pagada de esos ingresos. Stat. 1878, capítulo 277, párrafos 6, 8. El hecho admitido por las partes al efecto de que tales ingresos probablemente bastarán para hacer frente a y extinguir todas las reclamaciones de daños por las tierras tomadas, no satisface los requisitos de la Constitución al efecto de que el dueño de las tierras tomadas para uso público deberá recibir una pronta y segura compensación sin exponerse a riesgos o a dilación irrazonable."

Para asegurar adecuadamente al dueño de la propiedad que habrá fondos para pagar el precio que finalmente señale

la corte, el Congreso prescribió en la sección 258–c, USCA, lo siguiente:

"No se tomará acción bajo la sección 258-a de este Título, irrevocablemente comprometiendo a los Estados Unidos al pago de la compensación que en definitiva sea fijada, a menos que el jefe del departamento ejecutivo o agencia o negocio del gobierno facultado para adquirir el terreno, sea de opinión que la compensación que en definitiva se fije estará comprendida dentro de cualesquiera límites prescritos por el Congreso en relación con el precio a ser pagado."

Asumiendo que esta disposición garantice adecuadamente el pago de la compensación, aun esa disposición fué omitida en nuestra ley local, y claro es que el hecho de que en la demanda de expropiación se diga que en opinión de los representantes de El Pueblo de Puerto Rico habrá fondos suficientes con qué pagar la compensación que en definitiva se fije, no puede tener efecto legal alguno, pues dicha certificación o manifestación no está sancionada por la ley.

¿Qué seguridad ofrece nuestra ley de expropiación forzosa o cualquier otra ley del país al efecto de que la compensación que finalmente determine la corte será inmediatamente pagada al dueño de la propiedad tomada? Ninguna en absoluto, pues de acuerdo con la Ley de Autoridad de Fuentes Fluviales, la Autoridad está autorizada para tomar dinero a préstamo y para emitir bonos de la Autoridad para cualquiera de sus fines corporativos y para garantizar el pago de sus bonos y "de todas y cualesquiera otras obligaciones mediante gravamen o pignoración de todos o cualesquiera de sus contratos, rentas o ingresos *solamente*." (Bastardillas nuestras.) Pero clara y terminantemente ha declarado el legislador en la citada Ley de Autoridad de Fuentes Fluviales que El Pueblo de Puerto Rico ni ninguna de sus subdivisiones políticas será responsable de cualesquiera bonos emitidos por la Autoridad ni de los intereses sobre los mismos. Sección 6 (d).

Tampoco suple el defecto de la ley el hecho de que por la número 94 de 1938 (Leyes de ese año, pág. 219) se provea

la forma o manera de levantar fondos para pagar el precio de la planta hidroeléctrica de Río Blanco, pues dicha ley sólo autoriza la compra, no la expropiación, y por consiguiente, aun asumiendo que los fondos a que se refiere dicha Ley núm. 94 fuesen suficientes para cubrir la compensación, éstos no podrían aplicarse a la adquisición por expropiación forzosa, puesto que como ya hemos dicho esa ley sólo autoriza la compra y no la expropiación. *State v. King County Superior Court,* (Wash.) 124 P. 127; *Littleton v. Berlin Mills Co.,* (N.H.), 58 A. 877; *Paris Mt. Water Co. v. Greenville,* (S.C.), 89 S.E. 669.

En tales circunstancias, preciso es concluir que la ley no cumple con el requisito constitucional de proveer adecuadamente el fondo necesario que asegure el pago del valor de la propiedad, según sea en definitiva determinado por los tribunales.

Por consiguiente, carece la corte de jurisdicción para dictar la orden de entrega en el presente caso, pues aparte de que, como hemos visto, el Comisionado del Interior no tiene facultad para expropiar la propiedad en cuestión, la ley tampoco hace la necesaria provisión de fondos, y siendo ello así, de sostener la órden de entrega, estaríamos infringiendo la cláusula constitucional que prohibe privar a una persona de sus bienes sin el debido proceso de ley y aun la misma cláusula que autoriza la expropiación forzosa de la propiedad particular para fines públicos, puesto que no se cumpliría con el requisito de la adecuada compensación.

*Por lo expuesto, procede declarar con lugar la petición de auto inhibitorio.*

El Juez Asociado Sr. Snyder no intervino.

EN MOCIÓN DE RECONSIDERACIÓN

Abril 10, 1942

Los demandados han presentado una moción en la que solicitan que reconsideremos nuestra sentencia de 18 de febrero último en cuanto a los siguientes extremos:

(1) Autoridad del Gobernador de Puerto Rico para establecer procedimiento de expropiación forzosa en aquellos casos en que la ley no designe específicamente el funcionario que deba representar a El Pueblo de Puerto Rico en dichos procedimientos.

(2) Efecto derogatorio de la Ley núm. 83 de mayo 2, 1941, que crea la Autoridad de Fuentes Fluviales; y

(3) Alcance y significado de la autorización establecida en la ley núm. 94, aprobada el 6 de mayo de 1938 y a virtud de la cual se autoriza y ordena al Comisionado del Interior de Puerto Rico para que adquiera por compra las propiedades de la planta hidroeléctrica de Río Blanco de acuerdo con los términos de la franquicia bajo la cual se han construído y se mantienen dichas propiedades.

Asumiendo que la citada Ley de la Autoridad de Fuentes Fluviales de 2 de mayo de 1941 no hubiese derogado totalmente la núm. 94 de 6 de mayo de 1938; asumiendo además que tanto el Gobernador como el Comisionado del Interior, este último a virtud de la citada ley núm. 94 de 1938, tuviesen facultad para establecer el procedimiento de expropiación forzosa en este caso y que la autoridad para adquirir por compra conlleve la de adquirir por expropiación, el resultado a que se llegó en nuestra sentencia antes citada no podría ser alterado porque según, expusimos en la opinión que sirvió de base a dicha sentencia, ni la ley de expropiación forzosa ni ninguna otra ofrecen seguridad alguna de que la compensación que finalmente determine la corte será inmediatamente pagada al dueño de la propiedad expropiada. No podría argüirse que la cantidad apropiada por la Ley núm. 94 de 1938 para adquirir por compra la franquicia podría utilizarse para adquirir por expropiación, porque dicha cantidad fué apropiada, conforme dispone la sección primera de la citada ley de 1938, para adquirir por compra la planta hidroeléctrica de Río Blanco *de acuerdo con los términos de la franquicia* que fué concedida a la Porto Rico Railway Light & Power Co. por la Comisión de Servicio Público en diciembre 27 de

1927, y aprobada por el Gobernador en enero 4 de 1928. Siendo ello así, dicho funcionario fué autorizado para adquirir por compra *de acuerdo con los términos y condiciones de la franquicia,* y por consiguiente en ninguna forma podría aplicarse dicha cantidad para adquirir por expropiación forzosa, puesto que en este último caso la cantidad a pagar por la propiedad no sería el precio estipulado en la franquicia sino el precio en el mercado que en definitiva habría de determinar la corte.

Por las razones expuestas, entendemos que sería académico entrar a considerar las cuestiones suscitadas por los demandados, cuestiones que quedan abiertas para ser consideradas en cualquier otro caso que pueda presentarse en el futuro.

*No ha lugar a la reconsideración solicitada.*